**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 4, 2015**

# In the Court of Appeals of Georgia

A15A1276. THE CORPS GROUP et al. v. AFTERBURNER, INC.   JE-062

A15A1277. LOHRENZ v. AFTERBURNER, INC.                  JE-063

ELLINGTON, Presiding Judge.

Appellants John Borneman, Kyle Howlin, John Underhill, and Carey Lohrenz[1] are former fighter pilots who, after working for the appellee, Afterburner, Inc., a military aviation-themed business consulting firm, formed their own competing military aviation-themed business consulting firm, appellant The Corps Group, and began advising companies on how to apply military battle methodology to business planning and development. Afterburner sued The Corps Group and the individual

---

[1] Lohrenz brought a separate appeal in Case No. A15A1277. She raised many of the same claims of error as those raised by the appellants in Case No. 15A1276. Because these cases involve the same parties, the same underlying lawsuit and judgment, and the same facts, we consolidate these cases.

appellants, alleging, inter alia,[2] that they had infringed on Afterburner's trademarks and trade dress in violation of the Lanham Act.[3] A Forsyth County jury returned a verdict finding that each of the appellants had intentionally infringed on Afterburner's trade dress and four of its trademarks and awarded Afterburner money damages. Thereafter, the trial court entered a final judgment permanently enjoining the appellants from using Afterburner's trade dress and trademarks. In response to Lohrenz's motion for judgment notwithstanding the verdict and extraordinary motion for a new trial, the trial court granted a new trial only as to the apportionment of monetary damages among The Corps Group and the individuals. The appellants contend, inter alia, that the trial court erred in denying their motions for a directed verdict and for judgment notwithstanding the verdict as to Afterburner's Lanham Act claims because the evidence was insufficient to support a finding that they had

---

[2] Afterburner also brought other federal and state law claims, and some of the individual appellants filed counterclaims. Most of those other claims resulted in a judgment for the claimant, and none is the subject of a claim of error on appeal.

[3] Afterburner averred in its amended complaints that it had superior rights to use various trade or service marks and trade dress under the Federal Trademark Act of 1946 (15 USC § 1051 et seq., also known as the Lanham Act).

infringed on Afterburner's trademarks or trade dress.[4] For the following reasons, we agree and reverse.

"The standard for granting a directed verdict [and] a judgment notwithstanding the verdict are the same." (Citation and punctuation omitted.) *South Fulton Medical Center v. Poe*, 224 Ga. App. 107, 108 (1) (480 SE2d 40) (1996).

> [O]n appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Footnote omitted.) *Vol Repairs II, Inc. v. Knight*, 322 Ga. App. 416 (745 SE2d 673) (2013). See also, *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014). Viewed in this light, the evidence presented at trial shows as follows.

---

[4] The appellants also contend that the injunction is fatally defective given its lack of specificity, that the trial court failed to properly instruct the jury as to assessing personal liability for the alleged infringement, and that the award of damages was excessive. Given our holding in these consolidated cases, these claims of error are moot.

Afterburner has been offering business consulting services since 1996. Afterburner's founder and CEO, James Murphy, is a former Air Force F-15 fighter pilot. After leaving the military, he decided to continue studying military mission-planning methods and to apply those methods to business development. In addition to applying what he had learned from his own military training and experience, Murphy obtained a license to teach a system called the "Prometheus Process," which was developed by retired Air Force Colonel John Warden, the owner of Venturist, Inc. The Prometheus Process is a military strategic planning model designed to help businesses and organizations define and achieve their goals. Murphy testified that, early on, Afterburner's business consulting model had many elements of the Prometheus Process incorporated within it. Murphy eventually terminated its licensing agreement with Venturist, Inc., and streamlined Afterburner's business consulting model.

Murphy described the Afterburner brand as "unique in the consulting space." It offers motivational keynote speakers, seminars and workshops that feature team-building exercises, corporate coaching, and leadership training. Afterburner focuses less on the long-term strategic planning of the Prometheus Process and more on teaching business people how to execute their goals through a continuous-

improvement cycle that Murphy illustrated in a model using the elements: "Plan, brief, execute, debrief, win, lessons learned." Murphy called this model the "Flawless Execution" model, and it became a key component of Afterburner's marketing. Afterburner developed a graphic illustrating its model, a single circle containing a spiral of arrows linking the words "plan, debrief, execute, debrief, win!" and used the graphic as a logo on its marketing materials and as a teaching tool in its presentations. The Flawless Execution model involved teaching business people how to avoid "task saturation" – that is, being overburdened by too many tasks – and how to develop "execution rhythm" – that is, an accountability process involving timely debriefings so that people will learn from their mistakes. Afterburner registered its circular logo and the phrases "Flawless Execution" and "task saturation" with the U. S. Patent and

Trademark Office.[5] It also contended that it had common law trademark[6] rights in the

phrase "execution rhythm."

[5] Afterburner asserts that its trademarks for "flawless execution" and "task saturation" are incontestible, but it provides no record citation to the requisite supporting evidence. A mark becomes incontestible when, five years after registering the mark, the holder files the affidavit required by 15 USC § 1065. Once a mark has become incontestable, its validity is presumed, subject to certain enumerated defenses. Id. Further, once a mark has achieved incontestable status, its validity cannot be challenged on the grounds that it is merely descriptive, even if the challenger can show that the mark was improperly registered initially. Id. See also *Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 FSupp.2d 1368, 1375 (III) (A) (1) (a) (1) (S.D. Ga. 2002) ("Under the 'type of mark' factor, an incontestable mark is presumed to be at least descriptive with secondary meaning.") (citation and punctuation omitted.) The trial record contains exhibits showing that these trademarks were registered. However, the record does not show that Afterburner filed the requisite affidavits and was thereafter notified by the Director of the U. S. Patent and Trademark Office that the affidavits were received. See *Homes & Land Affiliates, LLC v. Homes & Loans Magazine, LLC*, 598 FSupp.2d 1248, 1261 (III) (A) (1) n.10 (M.D. Fla. 2009) (Plaintiff failed to provide the court with proof of filing the required affidavit.). Consequently, we do not assume that the marks are incontestible.

[6] Afterburner refers to its marks interchangeably as "trademarks" or "service marks." While a "trademark" identifies and distinguishes a product, a "service mark" identifies and distinguishes a service. See, e.g., *Safeway Stores, Inc., v. Safeway Discount Drugs, Inc.*, 675 F2d 1160, 1163 (II) (11th Cir. 1982); *Breakers of Palm Beach, Inc. v. Intl. Beach Hotel Dev., Inc.*, 824 FSupp. 1576, 1579 n.2 (S.D. Fla. 1993). Courts conduct the same analysis for service mark and trademark infringement claims. *Tana v. Dantanna's*, 611 F3d 767, 772 n.3 (11th Cir. 2010) ("The infringement analysis is the same under both standards and courts thus treat the two terms as interchangeable in adjudicating infringement claims.") (citation and punctuation omitted). Consequently, we do not address whether the marks are service marks or trademarks.

Afterburner also claimed that it had the exclusive right to use its "trade dress," what Murphy described as a fighter pilot motif that pervaded all aspects of its business consulting services. Murphy testified that Afterburner's use of real pilots wearing standard-issue, sage green flight suits during business consulting presentations constituted the most relevant features of Afterburner's trade dress. Afterburner also decorated its seminars like military bunkers and squadron rooms, often draping conference rooms with parachutes and camouflage netting. It employed loud music, sirens, and theatrical mock enemy attacks. During consulting exercises, Afterburner often engaged clients in military exercises, using maps, check-lists, and other military-style mission-planning paraphernalia. Clients sometimes even wore flight helmets during workshops. Murphy believed that Afterburner had the exclusive right to use fighter pilot and jet plane imagery during its seminars, on its website, and in its brochures and other marketing materials.

John Borneman, the CEO of The Corps Group, testified that when he formed his company in 2008, he knew that it would compete with Afterburner. He testified that he intended to start a Marine Corps aviation-themed business consulting group using a modified "Org-X" version of the Prometheus Process, as well as his own personal experience, in teaching clients how to apply military mission-planning

principles to business development. Toward that end, he obtained permission to use the Prometheus Process from Venturist, Inc. Although The Corps Group offered business consulting services that were similar to Afterburner's, like keynote speakers and team-building seminars and work-shops, Borneman testified that its primary focus was on establishing long-term, strategic business planning relationships with clients.

When Borneman was forming The Corps Group, Lohrenz researched their competitors. Lohrenz testified that several individuals and companies offered similar military aviation-themed business consulting services, including Boston Consulting Group, CVM Insights, Mission Excellence, Rob Waldman, Fighter Pilots USA, Mach2, and Check-6. These companies commonly used images of fighter planes, pilots in flight suits, and military jargon (including the plan-execute-debrief model) in their marketing. One of the consulting services had even discussed how the military uses "a concept of flawless execution."

In using the Prometheus Process in its business consulting, The Corps Group's presenters discussed, among other things, the military's plan-execute-debrief model, as well as the concepts of "task overload" and "execution cadence." Borneman testified that, although he and his business associates have discussed with clients the

phenomenon of "task saturation"[7] – military jargon describing the condition of having too much to do in a short period of time or with inadequate resources – The Corps Group never used the phrase as a slogan for a product or a service. Rather, its marketing contained the phrase "task overload." Also, it did not use the phrases "flawless execution" or "execution rhythm." Rather, when marketing or discussing the military plan-execute-debrief model, it used the phrases "Corps execution," "leaders in business execution," and "execution cadence." It illustrated these principles in a diagram depicting three circles in a row, each containing the words "plan, do, debrief" and arrows signifying the cyclical nature of the process. The diagram was used in a "white paper" – a teaching tool – but not in its marketing materials. Borneman testified that these concepts, terms, and processes are part of the Prometheus Process – which is "at the heart of what [The Corps Group does]" – and were not taken from Afterburner. Further, both The Corps Group's "execution cadence" and Afterburner's "execution rhythm" are derived from the term "battle rhythm," a military term used to describe the process of determining the appropriate tactical response to highly changeable battlefield conditions. One of Afterburner's

---

[7] Lohrenz testified that she displayed the phrase "task saturation" once during a day-long seminar. It was a concept noted on a Power Point slide during a discussion of "one of the things that can happen to affect your ability to execute [the mission.]"

former employees testified that the "mission, brief, plan, execute, after-action review, lessons learned" process is inherently part of military culture, a process he routinely experienced during his Navy aviation career. Part of the process is also sometimes taught as the "OODA Loop," for "observe, orient, decide, act."

Witnesses for The Corps Group also testified that, other than employing fighter pilots as business consultants and using fighter pilot imagery in their marketing materials, The Corps Group's presentation style differed from Afterburner's. They used none of the theatrical stage settings that Afterburner used during its seminars – no bunkers, no camouflage netting, no theatrical enemy attacks or loud music. They wore their flight suits on stage very rarely, and typically only when a client requested that they do so. They did, however, engage their clients in military-themed exercises, but those exercises were not owned by Afterburner. The Corps Group stressed a Marine Corps theme as opposed to an Air Force theme. And it used its own trade name and distinctive logo on its marketing materials and presentation materials.

The record shows that both Afterburner and The Corps Group market their services to sophisticated business executives, many of whom represent "Fortune 500" companies. Afterburner markets its services primarily through an agent, the International Speaker's Bureau. The Corps Group rarely used an agent; rather, it

relied on client referrals. Afterburner did not identify any client or potential client who had been confused by the parties' trademarks or by the use of military aviation-themed trade dress. Afterburner's own booking agent did not identify anyone who had been confused as to the source of the services offered by either The Corps Group or by Afterburner.

1. *Afterburner's Trademark Claims*. The jury found that The Corps Group violated the Lanham Act by infringing upon Afterburner's registered trademarks "task saturation," "flawless execution," and its circular logo containing the words "plan, brief, execute, debrief, win!" It also found that The Corps Group infringed upon Afterburner's common law trademark "execution rhythm." The Corps Group and the individual appellants argue that they were entitled to a defense judgment because the evidence shows that Afterburner's trademarks are weak, that the parties' respective marks are sufficiently dissimilar, that there was no intent to infringe, and that no client or potential client was confused by any similarity in the parties' trademarks.

The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof" that is used by a person "to identify and distinguish his or her goods . . . and to indicate the source of the goods[.]" See 15 USC § 1127.[8] The

_____

[8] This section defines service marks similarly.

Act ensures that a trademark can serve the function of distinguishing one business's goods or services by prohibiting others from using a similar mark in a way that is "likely to cause confusion" among consumers (that is, by making consumers wonder which business created or offered which products or services). See 15 U.S.C. § 1125 (a) (1) (A).[9]

> Under the Lanham Act, 15 U.S.C. § 1114 (1), a defendant is liable for infringement, if, without consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." Thus, to prevail [on a civil infringement claim brought pursuant to 15 USC § 1125], a plaintiff must demonstrate (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion.

(Citations omitted.) *Frehling Enterprises., Inc. v. Intl. Select Group, Inc.*, 192 F3d 1330, 1335 (III) (11th Cir. 1999). "Likelihood of confusion means probable confusion rather than mere possible confusion." *Atlanta Allergy & Asthma Clinic v. Allergy & Asthma of Atlanta,* 685 FSupp.2d 1360, 1376 (B) (2) (N.D. Ga. 2010). Trademark

---

[9] Trademark law under the Lanham Act serves two essential functions. It aids consumers by assuring them that products with the same trademark come from the same source and it protects the economic investments of the trademark owner. See *Qualitex Co. v. Jacobson Products Co.*, 514 US 159, 163-164 (II) (131 LE2d 248, 115 SCt 1300) (1995).

12

rights for unregistered marks may be gained in the common law through actual prior use in commerce. *Tally-Ho, Inc. v. Coast Community College District*, 889 F2d 1018, 1022 (II) (A) (11th Cir. 1990).

The appellants do not dispute that Afterburner's marks have priority; rather, they contend they were entitled to a judgment in their favor because Afterburner failed to carry its burden of proving that a likelihood of consumer confusion exists between the parties' trademarks. Indeed, the "central inquiry" in an infringement case is "whether there is a 'likelihood of confusion' on the part of consumers between the names and symbols used by the two parties." (Footnote omitted.) *Freedom Sav. & Loan Assn. v. Way*, 757 F2d 1176, 1179 (I) (11th Cir. 1985). See also *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F2d 966, 972 (III) (11th Cir. 1983) ("[T]he critical question in most [infringement actions] is whether there is a likelihood of confusion, mistake, or deception between the registered mark and the allegedly infringing mark.") (citation and footnote omitted.)

The Eleventh Circuit has adopted a seven-factor test to determine whether the likelihood of consumer confusion exists in an infringement action. The factors include: (1) the strength of the plaintiff's mark, (2) the similarity of the marks, (3) the similarity of the goods or services the marks represent, (4) the similarity of the

13

parties' retail outlets and customers, (5) the similarity of advertising media, (6) the defendant's intent, and (7) evidence of actual confusion. *Frehling Enterprises, Inc. v. Intl. Select Group, Inc.*, 192 F.3d at 1335 (III). "The extent to which two marks are confusingly similar cannot be assessed without considering all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F2d 1484, 1488 (II) (B) (11th Cir. 1987). However, of the seven factors, "the [strength] of [the] mark and the evidence of actual confusion are the most important." (Citation omitted.) *Frehling Enterprises, Inc. v. Intl. Select Group, Inc.*, 192 F3d at 1335 (III). See also *Suntree Technologies., Inc. v. Ecosense Intl., Inc.*, 693 F3d 1338, 1346 (III) (B) (1) (11th Cir. 2012) (accord).

In performing our review of whether there exists a likelihood of consumer confusion in a trademark infringement case under the Lanham Act, this Court must consider and evaluate the evidence supporting each of the *Frehling* factors and consider the weight to be accorded to each of the factors under the totality of the circumstances. See *Custom Mfg. and Engineering, Inc. v. Midway Svcs.*, 508 F3d 641, 649 (11th Cir. 2007) ("[A]pplication of the *Frehling* factors entails more than the

14

mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'") (citations omitted).

(a) *Strength of the trademarks*. "The strength of a trademark is essentially a consideration of distinctiveness. The stronger (i.e., the more distinctive) the mark, the greater the scope of protection accorded it, and the weaker the mark, the less trademark protection it receives." (Citations and punctuation omitted.) *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 FSupp.2d 1293, 1310 (B) (1) (a) (N.D. Ga. 2008). See also *Frehling Enters., Inc. v. International Select Group, Inc.*, 192 F3d at 1335 (III) (accord).

> The strength of a trademark depends on the mark's classification and the degree to which third parties use the mark or components thereof. Trademarks may be classified, in descending order of strength, as (1) arbitrary or fanciful marks, which bear no logical relationship to the product that they represent, (2) suggestive marks, which refer to some characteristic of the product that they represent, but for which a leap of imagination is required to get from the mark to the product, (3) descriptive marks, which identify a characteristic or quality of the product they represent, and (4) generic marks.

(Citations omitted.) *Alaven Consumer Healthcare, Inc. v. DrFloras*, *LLC* (Case No. 1:09-CV-705-TWT, N.D. Ga., decided February 4, 2010) (2010 U.S. Dist. LEXIS

9366, 4-5 (III) (A) (1)). See also *Welding Svcs., Inc. v. Forman*, 509 F.3d 1351, 1357-1358 (III) (11th Cir. 2007) (accord).

Because Afterburner's registered trademarks have a presumption of validity, see 15 U.S.C. § 1057(b), the trademarks are presumed distinctive rather than merely descriptive; however, that presumption may be rebutted. See *Welding Svcs. v. Forman*, 509 F3d at 1357 (III) n.3. ("Registration establishes a rebuttable presumption that the marks are protectable or 'distinctive.'") (citations omitted); *Scientific Applications, Inc. v. Energy Conservation Corp. of America*, 436 FSupp. 354, 360 (N.D. Ga. 1977) (accord).

In this case, the Corps Group presented evidence rebutting the presumption that the registered trademarks are distinctive by showing that Afterburner's marks describe processes and concepts taught both in the military and in military-themed business consulting. For example, it does not take a leap of imagination to deduce that "flawless execution" as used in the context of business consulting describes a

16

process for successfully performing a business plan.[10] All of Afterburner's marks tend toward the descriptive end of the trademark classification spectrum.[11]

Further, the evidence shows that the plan-execute-debrief process, as well as the terms "execution," "task saturation" and "battle rhythm" are used in Air Force, Marine Corps, and Navy aviation. Thus, components of Afterburner's trademarks are common military concepts, processes, or terms. Also, these processes and concepts are not unique to any one military-themed business consulting group. Venturist, Inc.'s Prometheus Process predated Afterburner's "Flawless Execution" model. It uses the

---

[10] For examples of descriptive marks, see *In re Nett Designs, Inc*., 236 F3d 1339, 1342 (II) (Fed. Cir. 2001) ("The Ultimate Bike Rack" was held to be a laudatory descriptive phrase.); *Spraying Systems Co. v. Delavan, Inc.*, 975 F2d 387, 395 (III) (B) (7th Cir. Ill. 1992) (In the context of a spray nozzle products, the prefix "-JET" was considered descriptive.); *Bernard v. Commerce Drug Co.*, 964 F2d 1338, 1341 (2d Cir. 1992) ("Arthriticare is a descriptive trademark in the context here presented. Clearly, the mark describes the problem or condition (arthritis) that the trademarked product is designed to remedy or otherwise deal with.") (citations omitted.); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc*., 873 F2d 985, 996 (III) (B) (7th Cir. 1989) ("LA, as applied to beer, stands for and describes low alcohol."); *Schmidt v. Quigg*, 609 FSupp. 227, 231 (E.D. Mich. 1985) ("Honey Baked Ham" is a descriptive mark that has acquired a secondary meaning.).

[11] "The demarcation between each category [of trademark] is more blurred than it is definite." (Footnote omitted.) *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F2d 1551, 1559 (2) (b). See also *Royal Palm Properties, LLC v. Premier Estate Properties*, (Case No. 10-80232-CV-COHN, S.D. Fla., decided April 15, 2010) (2010 U.S. Dist. LEXIS 47971, (II) (B)) (accord).

same core processes and concepts and many of the same military terms. The Corps Group demonstrated that other business consulting groups also teach these concepts and processes and use components of the same terms in their marketing, and that at least one other consultant used the term "flawless execution." This fairly wide-spread third-party use of the military jargon which makes up components of Afterburner's trademarks weakens them and diminishes the level of protection afforded the marks.[12] Finally, Afterburner presented no evidence demonstrating that the trademarks at issue had become so associated with it that the marks had acquired secondary meaning.[13]

---

[12] See *Nutri/System, Inc. v. Con-Stan Indus.*, 809 F2d 601, 605 (B) (9th Cir. 1987) (finding "Nutri/System" to be a weak mark because "those in the food and health products field commonly use 'Nutri' as a prefix"); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Assn.*, 651 F2d 311, 317 (II) (A) (5th Cir. 1981) ("[W]e find the extensive third-party use of the word 'Sun' impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal.") (citations omitted); *Alaven Consumer Healthcare, Inc. v. DrFloras*, *LLC* (Case No. 1:09-CV-705-TWT, N.D. Ga., decided February 4, 2010) (2010 U.S. Dist. LEXIS 9366, 4-5 (III) (A) (1)). (The court held that the widespread third-party use of the prefix "Dr." weakened the plaintiff's suggestive mark and diminished the level of protection it was afforded.);

[13] A descriptive trademark or a service mark develops secondary meaning when the consuming public associates the mark with a single source. See, e.g. *American Television & Communications. Corp. v. American Communications & Television, Inc.*, 810 F2d 1546, 1549 (II) (11th Cir.1987)("In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer."); *Univ. of Georgia Athletic Assn. v. Laite,* 756 F2d 1535, 1540 (11th Cir. 1985) (accord).

The record evidence demonstrates that Afterburner's trademarks are weak; consequently, this factor weighs in favor of The Corps Group.

(b) *Similarity between the marks*. To assess the similarity of the trademarks, courts "compare[] the marks and consider[] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." (Citation omitted.) *Frehling Enterprises, Inc. v. Intl. Select Group, Inc*., 192 F3d at 1337 (III) (2). "However, courts may still view the component parts of conflicting composite marks as a preliminary step on the way to an ultimate determination of probable customer reaction to the conflicting composites as a whole." (Citation and punctuation omitted.) *Alaven Consumer Healthcare, Inc. v. DrFloras*, *LLC* (Case No. 1:09-CV-705-TWT, N.D. Ga., decided February 4, 2010) (2010 U.S. Dist. LEXIS 9366, 7 (III) (A) (2)). See also *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Assn.*, 651 F2d at 316 (II) (A) (separately analyzing the strength and similarity of the prefix "sun").

There are some obvious similarities between the appearance, sound and meaning of the parties' contested marks. The marks "Flawless Execution" and "Corps execution" are similar, but that similarity is due, in large part, to the shared word "execution," which is a word that describes, in military parlance, getting the job done.

"Task overload" and "task saturation" are similar phrases, but, again, that similarity is due to the shared word "task," which describes a job to do, and the shared idea of having too much to do. The same is true of the phrases "execution rhythm" and "execution cadence." The marks share a common descriptive word, "execution," the words "rhythm" and "cadence" are synonyms, and both phrases are derivative of the military phrase "battle rhythm." And, finally, Afterburner's circular logo containing the words "plan, brief, execute, debrief, win!" is similar to The Corps Group's diagram (which was not used in the Corps Group's marketing) containing three linked circles each containing the words "plan, do, debrief." The similarity, though, derives from the fact that both images illustrate the cyclical process of military mission planning that aims for continuous improvement. Thus, although the evidence shows that the contested marks have common elements ("task," "execution," "plan," "debrief" and the cyclical nature of a process), those elements are highly descriptive (and possibly even generic) of terms and processes used both in the military and in the field of military-themed business consulting.

Given the presence of these common descriptive elements in the contested marks, even small variations between them are enough to distinguish the marks, particularly in the context of business consulting services where the common

elements are understood to describe the services rendered. See, e.g., *John H. Harland Co. v. Clarke Checks, Inc*., 711 F2d at 975-976 (III) (B) (finding only nominal similarity between the marks "Memory Stub" and "Entry Stub" in the context of bank check products given the presence of the generic word "stub"); *Beech-Nut, Inc. v. Warner-Lambert Co.*, 346 FSupp. 547, 549 (S.D.N.Y. 1972) (holding that "Breath Pleasers" did not infringe on "Breath Savers" in part because, in the context of breath-freshening candies, "where the key word [breath] is as free as air, small variations are likely to make enough of a difference to ward off charges of infringement") (citations omitted); *Alaven Consumer Healthcare, Inc. v. DrFloras, LLC* (Case No. 1:09-CV-705-TWT, N.D. Ga., decided February 4, 2010) (2010 U.S. Dist. LEXIS 9366, 6 (III) (A) (2)). ("Although both marks incorporate plants, the similarities are insufficient to create confusion, particularly among herbal supplements."). Thus, this factor weighs in favor of The Corps Group.

(c) *Similarity of the parties' services, clients, and advertising methods*. Both Afterburner and The Corps Group are similar in that they sell military aviation-themed business consulting services. They do not sell a product in a retail outlet; rather they market their services to business executives, the majority of whom are sophisticated and selective. Because the consumers of the parties' business consulting

services are making a decision to spend thousands of dollars for a specialized service, there is less of a likelihood of confusion. See *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F2d 166, 173-174 (III) (8) (5th Cir. 1986) (reasoning that because purchasers were "buying for professional and institutional purposes at a cost in the thousands of dollars, they are virtually certain to be informed, deliberative buyers") (citation omitted). The parties also market those services in a number of ways, including websites and referrals. However, the evidence adduced showed that the parties rely primarily on different marketing strategies, that they seek different types of consulting relationships, and that they have different consulting styles. For example, The Corps Group focuses on developing long-term client relationships using the more detailed Prometheus Process whereas Afterburner focuses on training businesses how to execute its business plans. Afterburner uses the services of a booking agent; The Corps Group does not. Afterburner has a highly theatrical style complete with military props; The Corps Group does not. Given this evidence, these factors weigh in favor of The Corps Group.

(d) *The Appellants' intent*. It is undisputed that The Corps Group and the individually named appellants intended to compete with Afterburner. But the Lanham Act does not protect against competition. Rather, it protects against unfair

22

competition in the form of customer confusion caused by the infringing use of trademarks.[14] Thus, for this factor to weigh against the appellants, Afterburner must show that they used its trademarks with the intention of deriving a benefit from Afterburner's business reputation or that The Corps Group was intentionally blind to the confusion between the parties' trademarks. *Frehling Enterprises, Inc. v. Intl. Select Group, Inc*., 192 F3d at 1340 (III) (6). Bad faith in the adoption and use of a trademark normally involves the imitation of packaging material and the use of similar marketing and distribution methods or other efforts by a party to "pass off" its product as that of another. See *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (III) (6) (5th Cir. 1980).

The evidence shows that the individual appellants were aware of Afterburner's trademarks, having been employed by the company with whom they now compete. While the jury may infer that there was an intent to imitate their competitors, the direct evidence does not support a finding that the appellants attempted to pass off The Corps Group's services as those of Afterburner. Borneman testified that he was

_____

[14] See *Libman Co. v. Vining Indus.*, 69 F3d 1360, 1363 (7th Cir. 1995) ("[The defendant] noticed that [the plaintiff's] brooms were selling briskly, inferred that consumers like brooms with contrasting color bands, and decided to climb on the bandwagon. We call that competition, not bad faith, provided there is no intention to confuse, and, so far as appears, there was none.") (citation omitted.)

sensitive to the fact that he had a non-solicitation agreement with Afterburner; consequently, he advised his clients of that relationship. Further, he and the appellants made efforts to distinguish The Corps Group's services from Afterburner's by adopting a unique logo and business style. "[A] defendant's use of its own well-known mark in conjunction with the specific mark of its product can serve to ensure that there arises no consumer confusion about the source of that product." (Citations omitted.) *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corp.*, 869 FSupp. 176, 182 (A) (2) (S.D.N.Y. 1994).

The appellants also testified that the concepts and terms that they were using in their marketing and seminars came from their own military experience and from the Prometheus Process, not from Afterburner. The appellants' testimony reveals that they had a good faith basis to use those terms and concepts and the diagrams that illustrated them. Moreover, the evidence shows that the appellants modified their terms, processes, and diagrams to distinguish them from those used by Afterburner. Finally, they did not believe that Afterburner had the exclusive right to market a military aviation-themed business consulting service, and that belief was correct. See Division 2, infra. Given this evidence, this factor weighs in favor of The Corps Group.

(e) *Actual confusion*. The Eleventh Circuit has held that "[a]ctual *consumer* confusion is the best evidence of likelihood of confusion." *AmBrit, Inc. v. Kraft, Inc.*, 812 F2d at 1543 (I) (C) (6) (emphasis supplied). "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight while confusion of actual customers of a business is worthy of substantial weight." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 936 (III) (A) (11th Cir. Ga. 2010). See also *Alliance Metals, Inc. of Atlanta v. Hinely Industries*, 222 F3d 895, 908 (III) (B) (11th Cir. 2000) (focusing on confusion of industrial aluminum buyers – including the trademark holder's customers – in the context of an infringement dispute between aluminum distributors).

Afterburner did not present any evidence of actual consumer confusion, despite the fact that the two companies had been competing with each other for six years and had each given hundreds of presentations, indicating that there was little likelihood of actual consumer confusion. See *Aktiebolaget Electrolux v. Armatron Intl., Inc.*, 999 F2d 1, 4 (1st Cir. 1993) (That "Weed Eaters" and "Leaf Eaters" coexisted on the market for six years with little actual confusion strongly suggested little likelihood of confusion.). In fact, during closing argument, Afterburner's trial counsel all but conceded that there was no evidence of actual confusion; stating:

25

""[W]hile I'd love to have all sorts of evidence of actual confusion to make my case a lot easier, I'm not required to have it[.]" . The lack of evidence of actual consumer confusion weighs in favor of The Corps Group.

Because all of these factors weigh in favor of The Corps Group, there is no need to balance them. Indeed, Afterburner failed to adduce evidence over which reasonable persons could differ on the issue of the likelihood of consumer confusion between its trademarks and The Corps Group's competing marks. The evidence on this issue is unambiguous and without conflict. This evidence, and all reasonable deductions from it, demands a verdict in favor of The Corps Group. Consequently, the trial court's order denying the Corps Group's motion for a directed verdict and motion for a judgment notwithstanding the verdict is clearly erroneous and must be reversed.

2. *Afterburner's Trade Dress Claims*. Afterburner alleged that The Corp Group infringed on its unregistered trade dress and that the infringing use constituted unfair competition. The appellants contend that Afterburner failed to present evidence demonstrating that it had a distinctive trade dress apart from an unprotectable style, theme, or idea.

Section 43 (a) (1) of The Lanham Act, which protects unregistered trademarks, also extends protection to unregistered trade dress. See *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209-210 (II) (120 SCt 1339, 146 LEd2d 182 (2000). See also *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F2d 821, 831 (III) (11th Cir. 1982). "Trade dress" is defined as "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." (Footnote omitted.) *AmBrit, Inc. v. Kraft, Inc.*, 812 F2d at 1535. Most trade dress infringement actions involve the packaging, design, or labeling of goods. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F2d at 980 (IV). However, trade dress protection also extends to the marketing of services. See *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 FSupp2d 489, 537 (VIII) (SDNY 2011) ("The term 'trade dress' has a broad meaning and is defined as the 'total image' of a business, good, or service 'as defined by its overall composition and design, including size, shape, color, texture, and graphics.'") (citation and footnote omitted). "Trade dress generally falls into one of two categories: product packaging or product design." (Citation and footnote omitted.) Id. It is difficult to fit a trade dress infringement claim involving the marketing and presentation style of business consulting services into one of these two

27

classifications; however, based on the way that Afterburner discusses its trade dress, we conclude that it is appropriate to analyze its trade dress as a species of product packaging. See id. In such cases, the "[t]he touchstone test for a violation of § 43(a) [of the Lanham Act] is the 'likelihood of confusion' resulting from the defendant's adoption of a trade dress similar to the plaintiff's." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d at 831-832 (III).

Additionally, although trade dress is the "total image" of a product, we note plaintiffs are required to articulate the specific items alleged to constitute that image.

> Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.

(Citation and punctuation omitted.) *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F3d 619, 634-635 (III) (B) (6th Cir. 2002).

Afterburner's trade dress claim fails because the evidence does not support a finding of distinctiveness[15] or that there exists any likelihood of consumer confusion[16] between Afterburner's trade dress and that of The Corps Group. Afterburner contends, essentially, that its trade dress is its military aviation-themed approach to business consulting. Murphy testified that Afterburner's use of real pilots wearing standard-issue, sage green flight suits during business consulting presentations constituted the most relevant features of Afterburner's trade dress. Afterburner also argues that it has the exclusive right to use, in the context of business consulting services, images of fighter pilots, flight suits, and jet planes on its website, brochures, and other marketing materials because these items distinguished the company's services. Afterburner also contends that its use of its theatrical props – e.g., bunkers, charts and maps, loud music, and camouflage netting, etc. – is also protected trade dress.

---

[15] Trade dress, like trademarks, may be classified as generic, descriptive, suggestive, or arbitrary. *AmBrit, Inc. v. Kraft, Inc.*, 812 F2d at 1537 (I) (A).

[16] It is undisputed that Afterburner presented no evidence of actual customer confusion as to the source of the parties' military-themed business consulting services. See Divisions 1 (e), supra.

The evidence shows that The Corps Group rarely used flight suits in its presentations and it did not use any of Afterburner's theatrical stage props. Rather, The Corps Group, like Afterburner, used fighter pilot imagery, concepts, themes, and processes. Further, the record reflects that Afterburner failed to specify which features of its jet fighter imagery are uniquely part of its trade dress, nor did it compare those specific features to the fighter-pilot imagery that The Corps Group used. And to the extent that The Corps Group used military-styled exercises (including maps, charts, and check-lists) in its presentations, the record does not establish that the exercises were developed by Afterburner or that the materials used mimicked in any significant way Afterburner's exercises. Instead, the evidence shows that Afterburner and The Corps Group (as well as many other business consulting groups) offered clients business consulting services based on military aviation planning methodologies and, in doing so, used imagery, processes, and concepts that referenced military aviation. In short, the evidence shows that Afterburner was seeking to protect a fighter-pilot *marketing theme* as opposed to a distinctive *trade dress*.

A marketing theme may be executed in a number of ways, whereas trade dress is unique. Afterburner enjoys trade dress protection with respect to its own distinctive combination of military elements and concepts, but not to the general elements and

concepts themselves. See, e.g., *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 FSupp.2d at 543 (B) (2). ("Pure Power, as a fitness facility, is not entitled to the exclusive use of fixed obstacles and a military theme – which may be executed in any number of ways. Pure Power enjoys protection only with respect to its own distinctive blend and manner of implementing these elements and concepts, and that implementation is quite different from the 'look and feel' of Warrior Fitness.")[17]

In this case, the record shows that The Corps Group and Afterburner both used fighter pilot imagery and concepts derived from military aviation, but that they applied them in different ways. Further, Afterburner failed to articulate, with any clarity, the way these military aviation-themed marketing components were put together in a unique way that set them apart from any other military aviation-themed

---

[17] See also *Prufrock Ltd. v. Lasater*, 781 F2d 129, 132 (II) (8th Cir. 1986) (To allow the plaintiff to protect its "country cooking concept under section 43 (a) of the Lanham Act would allow it to appropriate the country cooking concept to the exclusion of all others.") (citations omitted); *Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 FSupp. 73, 75 (S.D.N.Y. 1980) ("It would be ludicrous . . . to suggest that[,] in our free enterprise system, one producer and not another is permitted to take advantage of [a Scandinavian-themed] marketing approach to enhance consumer reception of its product."); *Denton v. Mr. Swiss of Missouri, Inc.*, 564 F2d 236, 243 (8th Cir. 1977) ("A franchisor does not have a business interest capable of protection in the mere method and style of doing business.") (citation omitted).

consulting business.[18] "The level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that that dress is no more than a concept or idea to be applied to particular products." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F3d 27, 33 (B) (1) (2d Cir. 1995). Because Afterburner failed to carry its burden of showing that it had a distinctive trade dress as opposed to a marketing theme, it was not entitled to trade dress protection under the Lanham Act. Consequently, the trial court erred in denying the appellants' motion for a directed verdict and motion for a judgment notwithstanding the verdict as to these claims.

3. Because we reverse the judgment in favor of Afterburner, the trial court's injunction, which was made a part of the final judgment, stands vacated.

*Judgment reversed. Dillard and McFadden, JJ., concur.*

---

[18] In its order enjoining The Corps Group from using Afterburner's trade dress, the court stated: "[W]hile the evidence at trial indicated that the Plaintiff routinely used flight suits, camouflage netting, parachutes, seminar materials mimicking fighter pilot mission planning documents, video-display screens mimicking fighter pilot jet radar screens, and/or fighter pilot theme[d] music, the Court cannot conclude which item, or combination of these items, if any of them, make up the Plaintiff's trade dress. The jury's verdict is silent in this regard." The jury's verdict is silent because Afterburner did not insist on a verdict form which asked the jury to make specific findings as to the components of Afterburner's trade dress. In fact, Afterburner rejected the detailed verdict form proposed by the court.