**ALLSTATE INSURANCE COMPANY,**
Petitioner,

v.

**AIRPORT MINI MALL, LLC, a Georgia Limited Liability Company doing business as Old National Discount Mall, Yes Assets, LLC, a Georgia Limited Liability Company, Chienjung Yeh, also known as Jerome Yeh, and Donald Yeh, Individually, Respondents.**

**CIVIL ACTION NO. 1:15–cv–3086–AT**

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 09/26/2017

Erica L. Parsons, Samuel Hancock Sabulis, Lueder, Larkin & Hunter, LLC, Atlanta, GA, for Petitioner.

Jeffrey D. Diamond, Law Offices of Jeffrey D. Diamond, Atlanta, GA, for Respondents.

## ORDER

Amy Totenberg, United States District Judge

This insurance coverage dispute arises out of the contributory trademark infringement action brought by Luxottica Group, S.p.A., and Oakley, Inc.[1], against Respondents Airport Mini Mall, LLC ("AMM"), Yes Assets LLC ("Yes"), Jerome Yeh, and Donald Yeh for the sale of counterfeit Ray–Ban and Oakley sunglasses at Respondents' discount mall. *See Luxottica Group, S.p.A., et al v. Airport Mini Mall, LLC, et al*, Civil Action No. 1:15–cv–01422–AT. Respondents obtained Commercial General Liability Insurance Policies from Allstate Insurance Company ("Allstate") in connection with their ownership and operation of the discount mall. Allstate filed a Motion for Summary Judgment [Doc. 51], seeking a declaration that Luxottica's trademark infringement claims are not covered under the Policies. Alternatively, Allstate seeks summary judgment in its favor that Respondents failed to comply with the Policies' notice provision as a condition precedent to coverage. For the reasons set forth below, the Court **GRANTS** Allstate's Motion for Summary Judgment.

## I. BACKGROUND

At all times relevant to this action, Respondents had Commercial General Liability Policies issued by Allstate to Yes Assets, LLC, Policy No. 648564370, and to Airport Mini Mall, LLC, Policy No. 648129676 (collectively "Policies") in connection with their ownership and operation of the Old National Discount Mall ("discount mall"). (Allstate SMF ¶ 19; Resp. SMF ¶ 19.) The Policies provide coverage for "Personal and Advertising Injury[2]" as follows:

**COVERAGE B PERSONAL AND ADVERTISING INJURY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking

---

1. As Oakley, Inc. is a subsidiary of Luxottica, the Court will refer to Luxottica and Oakley jointly as "Luxottica" for simplicity.

2. Although the Policies combine "personal injury" and "advertising injury" together, this case only involves an alleged advertising injury. Therefore, the Court will discuss only those portions of the Policies dealing with "advertising injury" for ease of reference and will omit any discussion of the portion of the Policies dealing strictly with "personal injury." *See* Berry, Stephen J., Georgia Property and Liability Insurance Law §§ 4:20, 4:26 (2013 ed.) (discussing the combination of "personal injury" and "advertising injury" into one definition in standard commercial general liability insurance policies and enumerating the offenses falling under "personal" versus those falling under "advertising" injury).

those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result.

. . . .

b. This insurance applies to "personal and advertising" injury caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

(Allstate SMF ¶ 20; Resp. SMF ¶ 20.) The Policies define "advertising injury" as injury "arising out of one or more" specifically identified offenses, including "the use of another's advertising idea in your 'advertisement';" and "infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" (*Id.*) "Advertisement" is defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." (*Id.*)

The Policies contain certain coverage exclusions:

2. **Exclusions**

This insurance does not apply to:

a. **Knowing Violations Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury;

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

. . . .

i. **Infringement of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

. . . .

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name, or metatag or any other similar tactics to mislead another's potential customers.

(*Id.*)

Finally, the Policies also include the following notice provision:

**SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS**

. . . .

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and address of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

(*Id.*)

On November 21, 2014, officers from the United States Department of Homeland Security and the College Park Police Department raided the Discount Mall and seized several thousand counterfeit items, including counterfeit Ray–Ban and Oakley products. (Compl., Ex. A, Doc. 2–1 ¶ 36; Allstate SMF ¶ 8; Resp. SMF ¶ 8.) The raid resulted in the arrest of 16 of the discount mall's tenants. (Compl., Ex. A, Doc. 2–1 ¶ 36.)

On December 9, 2014, Luxottica sent a cease and desist letter to Respondents AMM, Jerome Yeh and Donald Yeh. (Allstate SMF ¶ 9; Resp. SMF ¶ 9; Ex. A, Allstate MSJ, Doc. 51–4 at 34–37.)[3] The December 9, 2014 letter was written by litigation counsel for Luxottica, Jason Groppe, and advised Respondents of the following: (1) tenants of the discount mall were engaged in selling counterfeit Ray–Ban and Oakley merchandise; (2) on November 21, 2014 law enforcement personnel seized more than 3,400 counterfeit Ray–Ban and Oakley products that were being sold by the tenants; (3) Luxottica could bring a civil action for damages and other relief under the Lanham Act for trademark infringement; (4) Respondents could be held liable as landlords for the trademark violations of their tenants if they knew of, had reason to know of, or were willfully blind to the sale of counterfeit goods; and (5) Luxottica intended to hold Respondents responsible for all damages if they failed to take action to prevent the sale of counterfeit products by the tenants at the discount mall. (*Id.*) The letter also demanded that Respondents take steps to prevent any further sale of the counterfeit goods and submit information to Luxottica detailing the steps Respondents would take to correct the problem as well as the names and contact information for the tenant-vendors responsible for selling the counterfeit merchandise. (Allstate SMF ¶ 10; Resp. SMF ¶ 10.)

On April 22, 2015, Luxottica sent Respondents a second cease and desist letter.[4] (Ex. A, Allstate MSJ, Doc. 51–4 at 48–52.) In the April 22, 2015 letter, Luxottica advised Respondents that on March 30, 2015, Luxottica's undercover investigator purchased counterfeit Ray–Ban products from four different vendors at the discount mall. Luxottica again advised Respondents that they could be held liable for the trademark violations of their tenants and that Luxottica intended to hold them responsible for all damages if they failed to take appropriate action to police the sale of counterfeit merchandise bearing Luxottica's trademarks. (*Id.*)

On April 29, 2015, Luxottica filed a Complaint against Respondents AMM, Yes, Jerome Yeh, and Donald Yeh for contributory trademark infringement under the Lanham Act.[5] (Allstate SMF ¶¶ 5, 12; Resp. SMF ¶¶ 5, 12; Compl., Ex. A, Doc. 2–1.) Respondents were served with the lawsuit on May 27, 2015. (Add'l SMF ¶ 17; Allstate Resp. ¶ 17.)

The Complaint, as amended, alleged that Respondents engaged in contributory

---

**3.** The letter is addressed to "Old National Discount Mall" and cc'd to Airport Mini Mall, LLC, Donald Yeh and Jerome Yeh.

**4.** The letter is addressed to "Old National Discount Mall, Attn: Owner/Manager" and is cc'd to Airport Mini Mall, LLC and Yes Assets, LLC.

**5.** On March 4, 2016, Luxottica was granted leave to amend the underlying complaint to add Jenny Yeh and Alice Jamison as additional defendants. (Allstate SMF ¶ 6; Resp. SMF ¶ 6; Ex. A, Allstate MSJ, Doc. 51–4.)

trademark infringement through their "ownership, operation, control, and management" of the discount mall. (Allstate SMF ¶ 2; Resp. SMF ¶ 2.) On several occasions Luxottica "discovered multiple vendors advertising, displaying, offering for sale, and/or selling in plain view counterfeit Ray–Ban and Oakley merchandise on property jointly owned, managed and operated by" the Respondents. (Id. ¶¶ 34–43; Allstate SMF ¶ 11; Resp. SMF ¶ 11.) Luxottica alleged that the discount mall vendors had engaged in direct trademark infringement and that Respondents' conduct constituted "contributory trademark infringement." (Allstate SMF ¶ 12; Resp. SMF ¶ 12.)

Specifically, Luxottica alleged that Respondents were "contributorily liable for the infringing activities" of their tenants because Respondents: (1) facilitated the counterfeiting activities of its tenants at the discount mall by supplying the means for the tenants to infringe Luxottica's trademarks and "with knowledge of such activities, deliberately or recklessly willfully blinded themselves to th[e] illegal conduct" in order to profit from the revenues it produced; (2) "acted with reckless disregard for, and in bad faith and with willful blindness toward Luxottica Group and Oakley's trademarks;" and (3) "either intentionally and deliberately, or with reckless disregard and willful blindness, benefitted from the illegal counterfeiting activities described herein." (Compl., Ex. A, Doc. 2–1; Allstate SMF ¶¶ 13–15; Resp. SMF ¶¶ 13–15.)

Respondents contracted with Greg Dickerson to provide property management services for the discount mall, and in that role Dickerson was responsible for overseeing the mall's day to day operations. (Add'l SMF ¶¶ 1–2; Allstate Resp. ¶¶ 1–2; Dickerson Dep. at 13.) Mr. Dickerson receives and opens any mail delivered to the discount mall, addressed to the "owner" and/or "manger." (Dickerson Dep. at 32.) All incoming mail is placed into a large container and Dickerson goes through the mail once a week. (Id.) Mr. Dickerson received both of Luxottica's cease and desist letters. Dickerson testified that he became aware of Luxottica's claim that thousands of counterfeit Ray–Ban and Oakley products were being sold at the discount mall and were seized during the November 2014 raid upon his receipt of Luxottica's December 2014 letter sent within a few days of the raid. (Dickerson Dep. at 27–32.) As soon as he opened both the December 2014 letter and the second April 2015 letter, Dickerson immediately passed the letters on to Respondents and their attorney Louis Bridges. (Id. at 36–40.) Respondents admitted to having received Luxottica's December 2014 and April 2015 cease and desist letters. (Luxottica Group, S.p.A., et al v. Airport Mini Mall, LLC, et al, Civil Action No. 1:15–cv–01422–AT, Answer, Doc. 15 ¶ 40; Am. Answer, Doc. 85 ¶¶ 40, 43.)

Mr. Dickerson was also responsible for using a "Public Address (P.A.)" system for advertising to the patrons of the discount mall. (Add'l SMF ¶ 3; Allstate Resp. ¶ 3.) Depending on Mr. Dickerson's schedule in the day to day management of the discount mall, the frequency of the announcements ranged from multiple announcements each day to once a week. (Add'l SMF ¶ 4; Allstate Resp. ¶ 4.) Mr. Dickerson customarily made the following announcements on the P.A. system:

1. "Dear ladies and gentleman in the International Discount Mall, we appreciate you coming in and shopping with us today. We have over 100 businesses with merchandise from all over the world, so be sure to browse through the Mall as you will see merchandise you may not have ever seen. We appreciate you com-

ing in today and wish you a good day!"

2. "Ladies and gentleman in the International Discount Mall. We appreciate you coming in today and hope you enjoy the more than 100 businesses in the Mall with merchandise from all over the world. Also be sure to stop in with one of the snack shops and smoothy shop for some really good food. Thank you for coming in and hope you have a good day!"

(Add'l SMF ¶ 5; Allstate Resp. ¶ 5.)

Allstate first received notice of the claim and the Luxottica lawsuit on June 26, 2015 when Respondents forwarded copies of the lawsuit to its agent, who contacted Allstate. (Allstate SMF ¶ 16; Resp. SMF ¶ 16.) By the time Allstate was notified, Respondents had already filed their answer in the underlying lawsuit. (Allstate SMF ¶ 17; Resp. SMF ¶ 17.) While asserting a reservation of rights, Allstate retained counsel to defend the lawsuit and represent Respondents through trial. (Allstate SMF ¶ 18; Resp. SMF ¶ 18.)

Luxottica's lawsuit against Respondents was tried before a jury from February 13, 2017 to February 28, 2017. The jury found that Respondents engaged in contributory trademark infringement of 19 of Luxottica's trademarks, but that Respondents had not acted willfully in contributing to their vendors' direct trademark infringement. (Civil Action No. 1:15–cv–1422, Doc. 160, Jury Verdict.) The jury awarded Luxottica $100,000 per trademark violation for a total judgment of $1,900,000. (Civil Action No. 1:15–cv–1422, Doc. 161, Judgment.)

## II. STANDARD FOR SUMMARY JUDGMENT

The Court must grant summary judgment if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material only if resolving the factual dispute might change the suit's outcome under the governing law. Id.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the movant has met this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings establishing a material issue of fact. Id. at 324–26, 106 S.Ct. 2548. The non-moving party "must set forth specific facts showing that there is a genuine [dispute] for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

When ruling on a motion for summary judgment, the Court must view all the evidence in the record in the light most favorable to Respondents, as the non-moving party, and resolve all factual disputes in their favor. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury [or factfinder at trial] or whether it is so one-sided that one party must prevail as a matter of

law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. ANALYSIS

Allstate seeks judgment in its favor, as a matter of law, that Luxottica's claims in the underlying action are not covered under the Policies because Luxottica's complaint did not allege an "advertising injury" to which the insurance applied. Alternatively, assuming there was an "advertising injury," Allstate argues that the Policies exclude coverage for damages caused by the insured's intentional conduct, criminal acts, publication of material with knowledge of its falsity, and for injury arising out of trademark infringement—all of which apply to Luxottica's claims against Respondents. Finally, Allstate contends that even if some coverage obligation did exist, Respondents failed to comply with the Policies' notice provision, which is a condition precedent to coverage. Thus, according to Allstate, it had no duty to defend or indemnify Respondents against Luxottica's claims in the underlying lawsuit.

Respondents assert that the Court should only address the narrow issue of Allstate's duty to defend because, at the time Allstate filed its motion, the underlying Luxottica action had not yet been litigated, tried or otherwise determined on its merits triggering Allstate's duty to indemnify. Respondents do not offer any authority for this contention, and the Georgia Court of Appeals has expressly rejected the argument that the issue of an insured's duty to indemnify is not ripe for determination prior to a finding of liability in an underlying action. *See ALEA London Ltd. v. Woodcock*, 286 Ga.App. 572, 649 S.E.2d 740, 746 (2007). According to Respondents, "the duty to defend exists if the claim potentially comes within the policy" and that "where the claim is one of potential coverage, doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured." (Resp., Doc. 53 at 18–19.) Respondents further contend that whether an insured gave the insurer timely notice of an event or occurrence under a policy is generally a question of fact and that triable issues exist regarding whether or not Respondents breached the notice condition.

### A. Georgia Law Applies to Issues of Insurance Contract Construction

■■ The parties agree that the Policies at issue are governed by Georgia contract law. "In Georgia, insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms." *Hays v. Georgia Farm Bureau Mut. Ins. Co.*, 314 Ga. App. 110, 722 S.E.2d 923, 925 (2012). Where the terms and conditions of an insurance policy are clear and unambiguous, the court simply enforces the contract according to its terms, regardless of whether doing so benefits the carrier or the insured. *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 288 Ga. 749, 707 S.E.2d 369, 371 (2011); *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90, 92 (2008).

■ To determine whether a claim against an insured falls within the insured's coverage requires a comparison of the provisions of the policy against the allegations of the underlying complaint. *See Travelers Prop. Cas. Co. of Am. v. Kansas City Landsmen, L.L.C.*, 592 Fed. Appx. 876, 882 (11th Cir. 2015) (citing *Nationwide Mut. Fire Ins. Co. v. Somers*, 264 Ga.App. 421, 591 S.E.2d 430, 433 (2003)). While insurance policies are construed in favor of the insured and against the insurance company, *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989), an unambiguous policy exclusion must be given effect "even if beneficial to the insurer and detrimental to the in-

sured" as the courts should "not strain to extend coverage where none was contracted or intended." *Somers*, 591 S.E.2d at 435.

In Georgia, an insurer's duty to indemnify and its duty to defend "are separate and independent obligations." *Penn–Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 224 Ga.App. 557, 481 S.E.2d 850, 852 (1997), *aff'd*, 268 Ga. 564, 490 S.E.2d 374 (Ga. 1997) ("*Penn–Am. Ins. I*"). The duty to indemnify is determined by the "true facts" as they are established in the underlying action. *See Woodcock*, 649 S.E.2d at 746; *Trizec Properties v. Biltmore Constr. Co.*, 767 F.2d 810, 812 (11th Cir. 1985) (holding that "duty to defend is separate and apart from the duty to indemnify[;] [thus] the insurer may be required to defend a suit even if the later true facts show there is no coverage"). An insurer's duty to defend is broader than its duty to indemnify. *Shafe v. Am. States Ins. Co.*, 288 Ga. App. 315, 653 S.E.2d 870, 873 (2007) (citing *Penn–Am. Ins. I*, 481 S.E.2d at 852). "Although an insurer need not indemnify an insured for a liability the insured incurs outside the terms of the insurance contract, an insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." *Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998) (citing *Penn–Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 268 Ga. 564, 490 S.E.2d 374, 376 (1997) ("*Penn–Am. Ins. II*") ).

To determine whether an insurer has a duty to defend, the court must examine the allegations of the complaint in conjunction with the relevant policy language "to determine whether a liability covered by the policy is *asserted*." *Penn–America Ins. I*, 481 S.E.2d at 852 (emphasis in original). If the facts as alleged in the complaint "bring the occurrence even arguably within the policy's coverage, the

insurer has a duty to defend the action." *Id.* No duty to defend exists if the allegations in the underlying complaint "unambiguously exclude coverage under the policy." *Penn–Am. II*, 490 S.E.2d at 376; *Auto–Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 297 Ga.App. 751, 678 S.E.2d 196, 199–200 (2009); *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assn.*, 288 Ga.App. 355, 654 S.E.2d 207 (2007). But the duty to defend will arise "if the claim potentially comes within the policy," and any "doubt as to liability and insurer's duty to defend should be resolved in favor of the insured." *Penn–Am. Ins. II*, 490 S.E.2d at 376; *Auto–Owners Ins. Co.*, 678 S.E.2d at 199–200.

In construing an insurance policy under Georgia law, the court is required to "consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other." *Woodcock*, 649 S.E.2d at 745 (citing O.C.G.A. § 13–2–2(4) ("the whole contract should be looked to in arriving at the construction of any part") ). The court should also avoid an interpretation of the policy which renders portions of the policy language meaningless. *Id.* (citing *Bd. of Regents v. A.B. & E., Inc.*, 182 Ga.App. 671, 357 S.E.2d 100 (1987) ).

**B. Whether Luxottica's Underlying Claims Against Respondents are Covered by the Allstate Policies**

No Georgia case has directly addressed the issue faced by this Court: whether Respondents' liability for contributory infringement of Luxottica's trademarks is a covered "advertising injury" under the Allstate Policies.

The Policies at issue here contain standard commercial general liability ("GCL") insurance policy coverage provisions for advertising injury. *See* Berry, Stephen J., Georgia Property and Liability Insurance

LAW § 4:20 (2013 ed.) (discussing standard GCL policies offered by the Insurance Service Office ("ISO")); Haigh, James L., HISTORICAL ANALYSIS OF THE CHANGES TO COVERAGE B (Clarion Legal's Insurance Law Institute 2003); Westerlind, James M., INSURANCE COVERAGE FOR LANHAM ACT CLAIMS UNDER SECTION B OF STANDARD CGL POLICIES, MEALEY'S EMERGING INSURANCE DISPUTES, Vol. 16 (August 18, 2011). Over the years since these standard policies have been adopted by insurance companies, the provisions for advertising injury coverage have undergone significant revision. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004).[6] As a result, many of the cases to which this Court may look for guidance in determining how to interpret these policy provisions are no longer directly applicable or relevant. According to the majority of practitioners, CGL policies were written to provide limited coverage for intellectual property claims such as trademark infringement. *See* Haigh, James L., HISTORICAL ANALYSIS OF THE CHANGES TO COVERAGE B (Clarion Legal's Insurance Law Institute 2003); Westerlind, James M., INSURANCE

COVERAGE FOR LANHAM ACT CLAIMS UNDER SECTION B OF STANDARD CGL POLICIES, MEALEY'S EMERGING INSURANCE DISPUTES, Vol. 16 (August 18, 2011).

Allstate's Policies insure Respondents against liability for "damages because of [ ] advertising injury," caused by an "offense" arising out of Respondent's business and obligate Allstate to defend "against any suit seeking those damages." (Allstate SMF ¶ 20; Resp. SMF ¶ 20.) The Policies define "advertising injury" in the context of two offenses: (1) injury arising out of "the use of another's advertising idea in your 'advertisement,'"[7] and (2) injury arising out of "infringing upon another's copyright, trade dress or slogan in your 'advertisement.'"[8] (Policies, Coverage B, §§ V(14)(f)&(g).) The Policies therefore unambiguously provide that an "advertising injury" must arise out of an "advertisement." (*Id.*) "Advertisement" is defined in the Policies as "a notice that is broadcast or published to the general public or specific market segments about *your* goods, products or services for the purpose of attracting customers or supporters." (*Id.* § V(1)) (emphasis added).

---

**6.** As summarized by the Eleventh Circuit in *Steinberg*:

Advertising injury coverage was first introduced into CGL policies in 1973 in the form of an endorsement. In 1986, ISO moved advertising injury coverage into the main policy form and made significant changes to the coverage by, among other things, introducing the four enumerated offenses defining "advertising injury" ... In 1998, ISO changed the much-litigated "misappropriation of advertising ideas or style of doing business" clause to "use of another's advertising idea" and changed "infringement of copyright, title or slogan" to "infringing upon another's copyright, trade dress or slogan." The 1998 revision also defined "advertisement" for the first time: "a notice that is broadcast or published in the general public or specific market segments about your goods, products or services for the purpose of attracting custom-

ers or supporters." In 2001, an intellectual property exclusion was added that barred coverage for "infringement of copyright, patent, trademark or trade secret." 393 F.3d at 1231, n.2 (internal citations omitted).

**7.** This provision in the standard GCL policy for "advertising injury" was changed in 1998 from "misappropriation of advertising ideas or style of doing business" as an enumerated offense to the current version contained in the Allstate Policies. Some of the cases discussed herein were based on the prior policy language dealing with misappropriation.

**8.** The prior version of this provision defined "advertising injury" to include "infringement of copyright, title, or slogan." The standard policy language was modified in 1998 to replace "title" with "trade dress" as a covered offense.

At the same time, the Policies contain an exclusion for "Infringement of Copyright, Patent, Trademark or Trade Secret," that provides that the insurance "does not apply to 'advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights ... However, this exclusion does not apply to infringement, in your 'advertisement," of copyright, trade dress or slogan." (Policies, Coverage B, § 2(i).) The Policies further state that "[u]nder this exclusion, such 'other intellectual property rights' do not include the use of another's advertising idea in your 'advertisement.'" *Id.* Thus, the Policies cover advertising injury arising out of trade dress infringement but not injury arising out of trademark infringement.

██ A claim falls within the coverage of the Policies for "advertising injury" if: (1) the underlying suit "alleged a cognizable advertising injury;" (2) Respondents "engaged in advertising;" (3) "there [is] some causal connection between the advertising injury and the advertising," and (4) coverage is not negated by an applicable policy exclusion. *See Steinberg*, 393 F.3d at 1232 (quoting *Elan Pharm. Research Corp.*, 144 F.3d at 1375). Allstate asserts that claims for trademark infringement do not trigger coverage for "advertising injury." But Allstate does not address whether Luxottica's underlying claim falls within either of the enumerated offenses in Section V of the Policies' definition of "advertising injury." Instead, Allstate's argument focuses on (1) the lack of a causal connection between the alleged "advertising" and the alleged injury resulting from the sale of counterfeit Ray–Ban and Oakley products by Respondents' tenants, and (2) the Policies' exclusions. Allstate relies exclusively on non-binding cases outside of Georgia and the Eleventh Circuit.

In response, Respondents contend that Mr. Dickerson's "acts of advertising the Old National Discount Mall's goods and services to the patrons of the Mall by regular public address announcements," satisfies the Policies' definition of "advertisement." (Resp. at 20–21.) As a result, Respondents argue that this "advertising" conducted on behalf of Respondents renders them "potentially liable" for "advertising injury" as defined by the Policies, sufficient under Georgia law to trigger Allstate's duty to defend Respondents in the Luxottica action. (*Id.* at 21.) Respondents offer nothing more in opposing Allstate's summary judgment motion and completely fail to address the applicability of the various coverage exclusions identified by Allstate. Indeed, Respondents concede that "[i]t is entirely possible that Allstate may owe only a duty of defense, but not indemnity, to the Airport Mini Mall Respondents. It is entirely possible that one or more of the stated policy exclusions may preclude Allstate's duty of indemnity." (*Id.*) Respondents hang their hats on the meritless argument that a determination of Allstate's duty of indemnity would be premature pending litigation of the merits of Luxottica's underlying action.

In short, and as explained below, the Court finds that it is clear from the provisions of the Policies as a whole that Luxottica's contributory trademark infringement claim is not "advertising injury" covered under the Policies. Luxottica's claim for contributory trademark infringement did not arise out of any *advertisement* by Respondents of *their* goods and services as defined by the Policies as necessary to invoke coverage for the underlying judgment. And because the claim for trademark infringement is expressly excluded from coverage under the Policies, the allegations in Luxottica's underlying complaint are insufficient to trigger Allstate's duty to defend.

To fall within the Policies' coverage provisions, the Court must first find that Luxottica's claim in the underlying suit alleges either an (1) injury arising out of the use of Luxottica's "advertising idea" in Respondents' "advertisement," or (2) injury arising out of infringement of Luxottica's "copyright, trade dress or slogan" in Respondent's "advertisement." (Policies, Coverage B, §§ V(14)(f) & (g).) While the Policies define the term "advertisement," they do not define the term "advertising idea."

Taking these in reverse, Luxottica's complaint alleges that Respondents are liable for contributory trademark infringement. Luxottica does not allege injury arising out of "infringement of a copyright, trade dress or slogan" as defined by the Policies. Although trademark and trade dress are similar and may overlap in some circumstances,[9] Georgia courts have recognized the distinctions between trademark and trade dress. A trademark is "any word, name, symbol, or device, or any combination thereof" that is used by a person "to identify and distinguish his or her goods and to indicate the source of the goods" and serves "the function of distinguishing one business's goods or services by prohibiting others from using a similar mark in a way that is 'likely to cause confusion' among consumers." *Corps Grp. v. Afterburner, Inc.*, 335 Ga.App. 138, 779 S.E.2d 383, 389 (2015), *reconsideration denied* (Dec. 7, 2015), *cert. denied* (May 9, 2016) (citing 15 U.S.C. § 1127); *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010) (Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods."); *see also* 15 U.S.C. § 1127.

Trade dress, on the other hand, is defined as "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Afterburner*, 779 S.E.2d at 395 (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). Trade dress infringement actions involve the packaging, design, or labeling of goods and trade dress protection also extends to the marketing of services. *Id.* (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). These distinctions are material in the context of this insurance coverage declaratory judgment action. *See James River Ins. Co. v. Bodywell Nutrition, LLC*, 842 F.Supp.2d 1351, 1354, 1356 (S.D. Fla. 2012) (refusing to find that complaint for trademark infringement, false advertising, and unfair competition included a claim for trade dress infringement for purposes of insurance coverage for advertising injury); *Liberty Corp. Capital Ltd. v. Sec. Safe Outlet, Inc.*, 937 F.Supp.2d 891, 906 (E.D. Ky. 2013), *aff'd sub nom. Liberty Corp. Capital Ltd. v. Sec. Safe Outlet*, 577 Fed. Appx. 399 (6th Cir. 2014) (rejecting insured's attempts to characterize underlying claim as a claim "under 'trade dress' or 'copyright' or 'slogan'" rather than a claim involving a trademark in order to get around the policy exclusion for trademark infringement claims because "trademarks and trade dress are separate and distinct causes of action under the Lanham Act"); *see also Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 464 (5th Cir. 2003) (noting that "as a theoretical matter, any trademark could constitute 'advertising.' That does not mean, however, that any trademark constitutes

---

**9.** Trademark and trade dress infringement claims are subject to the same analysis and

the same protections under the Lanham Act.

'advertising' under the terms of this insurance policy).

Neither the Georgia courts nor the Eleventh Circuit's cases interpreting a policy under Georgia law have expressly addressed whether "the use of another's advertising idea" encompasses a claim for trademark infringement for the purpose of determining coverage for an "advertising injury." Other courts have differed on this issue under the various versions of the CGL policies. *Compare Sport Supply Group*, 335 F.3d at 464 (applying Texas law, infringed trademark held to be a "label that serves primarily to identify and distinguish products," not an "advertising idea"), *Callas Enterprises, Inc. v. Travelers Indem. Co. of Am.*, 193 F.3d 952 (8th Cir. 1999) (holding that alleged trademark infringement was not "misappropriation of advertising ideas or style of doing business" and that trademark was not "copyright," "title," or "slogan" within the meaning of commercial general liability (CGL) insurance policy coverage for "advertising injury"), *and Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 803 (6th Cir. 1996) (concluding that allegations of trademark and trade dress infringement not covered because of "the absence from the policy definition of 'advertising injury' of any express reference to trademark infringement" and "[r]ecognition of trademark and trade dress infringement as a distinct category of actionable conduct is so common" that if the insurer had intended to provide coverage for such liabilities,

it would have written the policy to state this explicitly, as it did in the case of "infringement of copyright, title or slogan")[10] *with State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 257–58 (4th Cir. 2003) (infringing use of Nissan's trademark on competing website held "misappropriation" of an "advertising idea"), *Cat Internet Servs., Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138, 142 (3d Cir. 2003) (holding that when a complaint alleges that an insured misappropriates and uses trademarks in connection with marketing and sales and for the purpose of gaining customers, the conduct constitutes "misappropriation of an advertising idea or style of doing business" because a trademark, like a brand name "is an advertising idea that may be created and 'owned,' and thus wrongfully taken or 'stolen' ") *and Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F.Supp.2d 1332 (S.D. Fla. 2001) (alleged trademark infringement in advertising and distribution of hair care products held covered under clause). *See also Ekco Group, Inc. v. Travelers Indem. Co. of Ill.*, 273 F.3d 409, 413–15 (1st Cir. 2001) (alleged copying of distinctive teapot design not covered because physical teapot style held not to be an "advertising idea").

The Eleventh Circuit construed the term "advertising idea" broadly to potentially include trade dress in *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1188–89 (11th Cir. 2002) (applying

---

10. The Eleventh Circuit criticized the separate reasoning of the Sixth Circuit in *Advance Watch* that the term "misappropriation of advertising ideas or style of doing business," did not refer to a category or grouping of actionable conduct that includes trademark or trade dress infringement. *See Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1189–90 (11th Cir. 2002); *Advance Watch*, 99 F.3d at 802–03 (relying on Michigan case law to find that "misappropriation of advertising ideas or style of doing business" does not necessarily

refer only to the common-law tort of misappropriation but does refer to the unauthorized taking or use of interests other than those which are eligible for protection under statutory or common-law trademark law). While the Court might agree with the Eleventh Circuit's discussion in *Hyman* regarding the scope of coverage under the "misappropriation" policy provision, such discussion is irrelevant to the interpretation of the Allstate policies which do not contain that provision.

Florida law in insured's declaratory judgment action seeking coverage under CGL policy in connection with a judgment entered against it for trade dress infringement and unfair competition under the Lanham Act). But the *Hyman* court declined to reach the issue of whether "trademark and trade dress infringement *inherently* involve advertising activity." *Hyman*, 304 F.3d at 1193, n.11 (emphasis added).

*Hyman* involved a prior version of the standard CGL policy for advertising injury than the one at issue here.[11] Unlike the Allstate Policies, the *Hyman* policy did not define "advertising injury" to expressly include injury arising out of trade dress infringement. The policy provision in *Hyman* defined "advertising injury" as including "misappropriation of advertising ideas or style of doing business." *Id.* 1184. As none of the terms in the policy were defined, the court found the ordinary meaning of the term "advertising idea" to include "any idea or concept related to the promotion of a product to the public." *Id.* (citing Black's Law Dictionary (7th ed. 1999) definition of "advertising" as "the action of drawing the public's attention to something to promote its sale"). The court in *Hyman* held that a product's trade dress *may* fall within the definition of "advertising idea" or "style of doing business" and that trade dress infringement

11. The policy at issue in *Hyman* was purchased in 1992. The standard CGL policy was revised in 1998 to specifically define for the first time the term "advertisement," to modify the enumerated offenses under the definition of "advertising injury," and to exclude coverage for certain types of infringement, including trademark infringement. The table below summarizes the differences between the relevant policy provisions at issue here and in *Hyman*:

| Allstate Policies | Hyman Policy |
| --- | --- |
| Define "advertising injury" as including the following offenses: "f. the use of another's advertising idea in your 'advertisement;' and g. infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" | Defines "advertising injury" as including the following offenses: "c. Misappropriation of advertising ideas or style of doing business; and d. Infringement of copyright, title or slogan." |
| Define "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." | No definition of "advertising" or "advertisement" included. |
| Contain the following exclusion: This insurance does not apply to "'advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your 'advertisement.' However, this exclusion does not apply to infringement, in your 'advertisement,' of copyright, trade dress or slogan." | Contains no similar exclusion. |

*may* constitute advertising injury under certain circumstances. *Id.* at 1189 (finding that because trade dress is defined as the "total image of a product" it may encompass particular marketing or sales techniques, but noting that trade dress infringement will not always constitute the "misappropriation of advertising ideas or style of doing business"). Though instructive, *Hyman*'s reasoning does not compel a finding that Luxottica's claim for trademark infringement falls within the Allstate Policies' coverage provisions for "advertising injury." The Court in *Hyman* was constrained to find that trade dress infringement might fall under the offense of misappropriation of an advertising idea, because trade dress infringement was not yet expressly included as an enumerated offense for advertising injury coverage.[12]

Construing the provisions of the Allstate Policies as a whole, to give effect to each provision, as required under Georgia law, the Court finds that the Policies' coverage for "advertising injury" does not apply to Luxottica's claim for contributory trademark infringement. *See Woodcock*, 649 S.E.2d at 745. Here, the Policies define "advertising injury" as including an injury resulting from trade dress infringement, but expressly exclude from coverage injury resulting from trademark infringement.[13] If the Court were to construe trademark and trade dress infringement as one and the same, such an interpretation would nullify the Policies' trademark exclusion. For this reason, it would be unreasonable to construe Luxottica's claim for trademark infringement as falling within the Policies' definition of advertising injury for "infringing upon another's copyright, trade dress, or slogan." Similarly, to construe the Policies' reference to "advertising idea" in § V(14)(f) as encompassing the concept of a trademark would be unreasonable in light of the Policies' exclusion for trademark infringement. Otherwise, an interpretation of the undefined term "advertising idea" as including a trademark would render the exclusion meaningless. Where an unambiguous policy exclusion applies, "a court need not stretch the allegations beyond reason to impose a duty on the insurer." *See James River Ins. Co.*, 842 F.Supp.2d at 1354–56 (differentiating claim for trademark infringement from that of slogan or trade dress infringement, and applying policy exclusion for "trademark" infringement to conclude that "underlying complaint did not explicitly or implicitly make an allegation of trade dress infringement."); *ShoLodge, Inc. v. Travelers Indem. Co. of Illinois*, 168 F.3d 256, 259–260 (6th Cir. 1999) (finding no coverage based on the absence of any express reference to trademark or service mark infringement in the policy's definition of advertising injury for "infringement of copyright, title, or slogan"). And as stated above, Respondents do not attempt to dispute the applicability of the exclusion to Luxottica's underlying claims.

Even assuming Luxottica's trademarks come within the scope of "advertising idea," in order to fall under the coverage provisions of the Policies, "the injury for which coverage is sought must be caused by the advertising itself." *E.g. Hyman*, 304 F.3d at 1191–2 (citing cases); *Bowden Inc. v. Aetna Cas. & Sur. Co.*, 977 F.Supp. 1475, 1480 (N.D. Ga. 1997) (citing

---

12. In contrast, the policy in *Hyman* defined "advertising injury" to include the offense of "infringement of copyright, title, or slogan." The standard policy language was subsequently modified to replace "title" with "trade dress" as a covered offense.

13. Having found that the policy exclusion for trademark infringement applies, the Court need not address the applicability of the remaining policy exclusions raised by Allstate in its Motion for Summary Judgment.

cases) ("[T]there must be a causal connection between an insured's advertising and the alleged injury ... an insured's advertising must have been the cause of whatever injury is alleged in the underlying suit.") In other words, "[w]here there is no advertising, there can be no advertising injury." *Hyman*, 304 F.3d at 1191–2 (citing *Liberty Mut. Ins. Co. v. Metro. Life Ins. Co.*, 260 F.3d 54, 62 (1st Cir. 2001).

Luxottica's original complaint, filed on April 29, 2015, contains no allegation that Respondents or their vendors engaged in any advertising. Luxottica's thirty page amended complaint, filed on March 4, 2016, makes two vague references to advertising: [14]

¶ 35. On November 13, 2014, [Luxottica's] investigator canvassed the Discount Mall and discovered multiple vendors <u>advertising</u>, displaying, offering for sale, and/or selling in plain view counterfeit Ray–Ban and Oakley merchandise on property jointly owned, managed and operated by the [Respondents].

¶ 37. [Luxottica's] investigator, who had accompanied the law enforcement officers during the raid, discovered that [Respondents] were distributing, <u>advertising</u>, publicly displaying, offering for sale, and/or selling 1,924 pair of sunglasses bearing logos and source-identifying indicia that are imitations of the Ray–Ban Trademarks and 1,514 pair of sunglasses bearing logos and source-identifying indicia that are imitations of the Oakley Trademarks

(hereinafter collectively referred to as the "Counterfeit Product").

(Ex. A, MSJ) (emphasis added).[15]

■ Despite broadly construing "advertising" in the context of the particular policy provision at issue, the *Hyman* court recognized that selling does not equal advertising. *Compare Hyman*, 304 F.3d at 1188 (citing *Sentex Sys., Inc. v. Hartford Accident & Indem. Co.*, 93 F.3d 578, 580 (9th Cir. 1996) ("In this day and age, advertising cannot be limited to written sales materials, and the concepts of marketing includes a wide variety of direct and indirect advertising strategies.") *with Hyman*, 304 F.3d at 1191–2 (citing *Poof Toy Prods., Inc. v. United States Fid. & Guar. Co.*, 891 F.Supp. 1228, 1234 (E.D. Mich. 1995) ("Courts have repeatedly rejected an insured's argument that advertising is part and parcel of selling and that an offense [that] occurs during selling is an offense committed in the course of the advertising.")). Indeed, the Eleventh Circuit expressly held that "[s]imply selling an infringing product is not sufficient to satisfy the causal connection requirement." *Id.* (citing *Poof Toy Prods., Inc.*, 891 F.Supp. at 1234. "[T]he infringement must be committed in an advertisement rather than in the sale of a product in order to be covered." *Id.* (citing *Dogloo, Inc. v. N. Ins. Co. of N.Y.*, 907 F.Supp. 1383, 1390–91 (C.D. Cal. 1995) and *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 750 n. 8 (3d Cir. 1999) (noting that "there is much confusion in the caselaw concerning when an 'advertising injury' is 'caused' by adver-

14. Luxottica was permitted by the Court to amend the complaint a year later to add Jenny Yeh and Alice Jamison as individual defendants based on evidence obtained during discovery that both Ms. Yeh and Ms. Jamison jointly manage, control and operate Yes and AMM along with Jerome and Donald Yeh.

15. Though not a separate/independent reference to advertising, the amended complaint further alleges that Respondents "have no license, authority, or other permission from Luxottica Group or Oakley to use any of the Ray–Ban or Oakley Trademarks in connection with the advertising, promoting, distributing, publicly displaying, selling, and/or offering for sale of the Counterfeit Product." (*Id.* ¶ 46.)

tising within the meaning of standard business insurance policies," and stating that the most reasonable approach is to require "that the injury be complete in the advertisement"); *see also U.S. Fidelity and Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146 (2nd Cir. 2016) (holding that the "parties could not have reasonably expected that the advertising injury coverage of the Policies would extend to the insured's sale of infringing goods" or that " 'advertising' would include the sale (without more) of counterfeit products").

▆▆▆ A bare allegation of advertising alone does not constitute an allegation of "advertising injury" where there is no causal connection between the alleged advertising and the alleged injury. *See Ekco Grp., Inc.*, 273 F.3d at 415 (cited by Eleventh Circuit in *Hyman* ) (finding no causal connection because "[n]othing in the . . . complaint suggests that it was concerned with . . . brochures or annual reports . . . The misappropriation offenses charged [in the] complaint were the physical reproduction and sale of a look-alike teapot by EKCO. That physical reproduction and sale were not done "in the course of" making brochures or annual reports."); *Fendi Adele S.R.L.*, 823 F.3d at 152 (rejecting argument that use of Fendi trademark constituted advertising because "[a]s a matter of common sense, there is a difference between the placement of a counterfeit brand label on a handbag and the act of soliciting customers through printed advertisements or other media. Here, the Fendi brand and logo were used as product identification (or, to be more precise, misidentification) rather than as advertisement").

Allstate asserts that neither the vague reference to Respondents' "advertising" in paragraph 37 of Luxottica's underlying amended complaint nor Mr. Dickerson's PA announcements at the discount mall are sufficient to trigger coverage for "ad-

vertising injury" under the Policies. The Court agrees. Luxottica's alleged injuries were the result of the sale of counterfeit Luxottica merchandise by Respondent's tenants, not from any "advertisement" by Respondents—as that term is defined in the Policies—as demonstrated by the lack of any argument or evidence of such advertisements at the trial. (*See* Am. Compl., Prayer for Relief at 28 (seeking "statutory damages per counterfeit mark per type of good offered for sale"); Jury Instructions, Doc. 155 at 20–21 (providing instructions for jury on statutory damages allowable to Luxottica for counterfeit goods sold, offered for sale, or distributed by the tenants at the Old Discount Mall).) *Cf., Hyman*, 304 F.3d at 1192–93 (finding causal connection between trade dress infringement and defendant's advertising activity where advertisement was a central part of the underlying litigation and argument and evidence of such advertisements were presented at trial). The amended complaint does not allege the infringement of Luxottica's trademarks in any "advertisement"—"a notice that is broadcast or published to the general public or specific market segments"—about *Respondents'* goods or services as opposed to the goods of the individual vendors in the discount mall. Luxottica's complaint alleges that the acts of Respondents' vendors "constitute direct trademark infringement" and that Respondents are liable due to their facilitation of the counterfeiting activities of their vendors by supplying the means for the vendors to sell infringing goods at the discount mall. As the underlying complaint makes clear, Luxottica's claim against Respondents was expressly one for contributory trademark infringement. Luxottica never asserted or presented any evidence at trial that Respondents themselves engaged in any direct infringement or sale of counterfeit Luxottica merchandise. (Am. Compl. ¶¶ 47, 56–57.)

Respondents' assertion that Mr. Dickerson's use of a PA announcement triggered Allstate's duty to defend is unpersuasive. Mr. Dickerson's announcements do not publicize Respondents' goods or services, but simply thanked the customers for shopping and encouraged them to visit the 100 businesses selling various merchandise and food. (*See* Add'l SMF ¶ 5; Allstate Resp. ¶ 5.) No mention was made of any of Luxottica's products in the PA announcements. Thus, these PA announcements cannot form the basis for any alleged "advertising injury" arising out of Respondents' "advertisements" under the express terms of the Policies.

This case is similar to *Colony Ins. Co. v. Frison Flea Mkt., Inc.* and *Marvisi v. Greenwich Ins. Co.*, and the courts' decisions on identical policy provisions in those cases are instructive.

In *Colony Ins. Co. v. Frison Flea Mkt., Inc.*, the owner of a flea market was found liable in an underlying action for contributory copyright infringement for facilitating its vendors' sale of counterfeit Coach merchandise. 2014 WL 4670908 at *5 (E.D. Mo. 2014). The flea market owner's insurer sought a declaration that there was no coverage for the judgment under the policy's provisions for "advertising injury" because the flea market was not found liable for any copyright infringement committed in an advertisement. *Id.* The Court found that "although the court in the underlying action mentioned advertising as one of the Flea Market's facilitation actions, nothing in its summary judgment order gives any indication that the Flea Market will be obligated to pay Coach for infringements committed within the Flea Market's advertisements." *Id.* (brackets, citations and ellipsis omitted). The court rejected the contention that the insurer had a duty to indemnify the flea market for injuries that were not the basis of the underlying court's finding of liability. *Id.* The court

further found the requisite causal connection was lacking between the sale of counterfeit goods and the flea market's advertisements (one of which allegedly displayed a Coach product), reasoning that sales and advertising are separate activities and the "vendors' infringing sales could have occurred independent and irrespective of any advertising by the Flea Market." *Id.* at *7. Thus, there was no duty to indemnify under the policy.

In *Marvisi v. Greenwich Ins. Co.*, the owner/landlord of a shopping center was sued by Louis Vuitton for contributory trademark infringement based on allegations that he induced and aided the infringement by providing his tenants with a safe haven and marketplace in which counterfeit goods could be sold. 2006 WL 1422693, *2 (S.D. N.Y. 2006). The underlying complaint contained no allegations that the shopping center owner engaged in any advertising, but did allege that the tenants had engaged in the "advertising and sale of counterfeit goods." *Id.* After Marvisi's insurer rejected his demand for coverage for the claims as alleging "advertising injury," he filed for a declaratory judgment that the insurer was obligated to provide a defense and indemnify Marvisi for the claims. *Id.* at *3. The court ruled in favor of the insurer finding that "coverage would only exist for injuries caused by the advertising of Marvisi's goods, products, or services," but the underlying action contained no allegations that Marvisi sold or advertised any "goods, products, or services," or that he otherwise had any personal involvement in the infringing conduct. *Id.* at *4–5. Under the express terms of the policy, the complaint's "oblique references to the advertising of counterfeit goods" by Marvisi's tenants were found by the court to be insufficient to require coverage because the policy provisions applied only to Marvisi as the named insured.

The Court is persuaded by the reasoning of these cases in finding that Luxottica's claim for contributory trademark infringement based on the sale of counterfeit merchandise by Respondent's tenants does not fall within the scope of "advertising injury" under the Allstate Policies. Because the facts supporting Luxottica's contributory infringement claim created no potential liability for any cause of action enumerated under the policy, the Luxottica action created no duty on the part of Allstate to defend or indemnify Respondents.

### C. Whether Respondents Complied with Allstate's Notice Provision

 Even assuming coverage under the Policy is available, Allstate is still entitled to summary judgment. As indicated above, the Policies require as a condition of coverage that the insured give notice to its insurer "as soon as practicable of an 'occurrence' or an offense which may result in a claim." (Policy § IV(2), Doc. 2–2 at 78.) Failure to comply with such a notice provision bars coverage under Georgia law. *See, e.g., Eells v. State Farm Mut. Auto. Ins. Co.*, 324 Ga.App. 901, 752 S.E.2d 70, 72 (2013) ("It is well established that a notice provision expressly made a condition precedent to coverage is valid and must be complied with, absent a showing of justification."); *Forshee v. Emp'rs Mut. Cas. Co.*, 309 Ga.App. 621, 711 S.E.2d 28, 31 (2011) (stating that "when an insurance policy includes a notice requirement as a condition precedent to coverage, and when the insured unreasonably fails to timely comply with the notice requirement, the insurer is not obligated to provide a defense or coverage"); *Kay–Lex Co. v. Essex Ins. Co.*, 286 Ga.App. 484, 649 S.E.2d 602, 606 (2007) (holding that if the insured fails

to demonstrate a justification for failing to give notice according to the terms of the policy, the insurer is not required to provide coverage); *Plantation Pipeline Co. v. Royal Indem. Co.*, 245 Ga.App. 23, 537 S.E.2d 165, 169 (2000) (holding that prompt notice requirements are valid under Georgia law "and must be complied with" to trigger coverage); *Brit UW Ltd. v. Hallister Prop. Dev., LLC*, 6 F.Supp.3d 1321, 1329 (N.D. Ga. 2014) (holding that in the absence of a justifiable or legally sufficient excuse, the insured's delay in providing notice of accident until after suit was filed barred coverage under its insurance policy).

Respondents' property manager, Greg Dickerson, testified that he became aware of Luxottica's claim that tenants at the discount mall were selling counterfeit Ray–Ban and Oakley products upon receipt of a cease and desist letter from Luxottica in early December 2014. Luxottica's letter arrived a few weeks after the November 21st raid conducted by federal and local law enforcement agents during which thousands of items of accused counterfeit merchandise were seized and vendors were arrested. Luxottica sent a second cease and desist letter on April 22, 2015, after its investigator made purchases of counterfeit Ray–Ban products from 4 different vendors at the discount mall. Respondents did not, however, notify Allstate of Luxottica's claims until June 26, 2015, after Luxottica's lawsuit was filed and Respondents had already filed an answer. Allstate asserts that Respondents' seven [16] month delay in providing notice deprived Allstate of its opportunity to investigate the circumstances, consider pre-suit options, or prepare to defend Respondents in the Underlying Lawsuit as it sought guid-

---

**16.** Allstate calculates the seven month delay from the date of the November 21, 2014 po-

lice raid.

ance from this Court regarding its coverage obligation.

The notice requirement at issue is set forth in Section IV of the Policies as follows:

### Section IV—COMMERCIAL GENERAL LIABILITY CONDITIONS

. . .

2. **Duties In The Event Of Occurrence, Offense, Claim or Suit**

 a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim . . .

 b. If a claim is made or "suit" is brought against any insured, you must:

 (1) Immediately record the specifics of the claim or "suit" and the date received; and

 (2) Notify us as soon as practicable.

(Policy § IV(2), Doc. 2–2 at 78–79.) The Policies' requirement that notice be provided "as soon as practicable" has been interpreted by Georgia Courts as requiring "immediate" notice based on the reasonable diligence of the insured under the circumstances. *Advocate Networks, LLC. v. Hartford Fire Ins. Co.*, 296 Ga.App. 338, 674 S.E.2d 617, 620 (2009); *Burkett v. Liberty Mut. Fire Ins. Co.*, 278 Ga.App. 681, 629 S.E.2d 558, 560 (2006); *State Farm Fire & Cas. Co. v. LeBlanc*, 494 Fed.Appx. 17, 21 (11th Cir. 2012) (noting that Georgia courts construe "prompt" as having the same meaning as such terms as "as soon as practicable" and "immediate" and noting that "prompt" when used as an adjective denotes "responding instantly"); *Bituminous Cas. Corp. v. J. B. Forrest & Sons, Inc.*, 132 Ga.App. 714, 209 S.E.2d 6, 9 (1974) (" 'Immediately' has been construed in many cases to mean with reasonable diligence and within a reasonable length of time in view of attending circumstances of each particular case.").

Georgia courts have repeatedly held that a notice provision such as the one in Allstate's Policies is a condition precedent to coverage. *See Res. Life Ins. Co. v. Buckner*, 304 Ga.App. 719, 698 S.E.2d 19, 27 (2010) (stating that a notice provision in an insurance policy is considered a condition precedent where it either expressly states that a failure to provide such notice will result in a forfeiture of the insured's rights or uses language which otherwise clearly expresses the intention that the notice provision be treated as a condition precedent); *Forshee*, 711 S.E.2d at 30–31 (construing policy language providing that "you must see to it" without more, as a condition precedent); *LeBlanc*, 494 Fed.Appx. at 21 (finding that notice provision was condition precedent under Georgia law, despite the fact that words "condition precedent" did not appear in notice provision, where notice provision stated "you must see to it" and appeared in section entitled "General Conditions" and a subsection entitled "Duties in the Event of . . . Claim or Suit").

■ Notice is made a condition precedent to coverage "so that insurers can be certain that they are given the opportunity to investigate the facts surrounding an incident promptly and to prepare a defense or settlement while the facts are still fresh and witnesses are still available." *Illinois Union Ins. Co. v. Sierra Contracting Corp.*, 744 F.Supp.2d 1349, 1351 (N.D. Ga. 2010) (citing *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 140 Ga.App. 215, 231 S.E.2d 245 (1976)); *Se. Express Sys. Inc. v. S. Guar. Ins. Co.*, 224 Ga.App. 697, 482 S.E.2d 433, 436 (1997); *Am. Ins. Co. v. Evercare Co.*, 699 F.Supp.2d 1361, 1366 (N.D. Ga. 2010), *aff'd*, 430 Fed.Appx. 795 (11th Cir. 2011). Thus, when an insured delays in giving notice without sufficient justification, the insurer is not obligated to provide coverage.

 The insured bears the burden of showing justification for a delay in providing notice to the insurer, which is generally a question of fact. *Kay–Lex Co.*, 649 S.E.2d at 606; *Woods v. State Farm Mut. Auto. Ins. Co.*, 234 Ga. 782, 218 S.E.2d 65, 68 (1975); *Plantation Pipeline*, 537 S.E.2d at 167. Whether notice occurred "as soon as practicable" is not always a question of fact; when the undisputed facts would preclude recovery, the issue of notice becomes a question of law appropriate for summary judgment. *See Kay–Lex Co.*, 649 S.E.2d at 606; *Caldwell v. State Farm Fire & Cas. Ins. Co.*, 192 Ga.App. 419, 385 S.E.2d 97, 99 (1989) (affirming grant of summary judgment to insurer based on insured's delay in providing notice of complaint for nine to ten months based on a fear of a rate increase); *Townsend v. Nat'l Union Fire Ins. Co.*, 196 Ga.App. 789, 397 S.E.2d 61, 62 (1990); *Longleaf in Vinings Homeowners Ass'n, Inc. v. QBE Ins. Corp.*, 1:13–CV–03132–AT, 2015 WL 11232360, *5 (N.D. Ga. Mar. 12, 2015) (Totenberg, J.), *aff'd* 646 Fed.Appx. 823, 825 (11th Cir. 2016) (granting summary judgment in favor of insurer and finding that insured's unreasonable delay in providing notice precluded coverage under insurance policy); *Cotton States Mut. Ins. Co. v. Int'l Surplus Lines Ins. Co.*, 652 F.Supp. 851, 856 (N.D. Ga. 1986); *Illinois Union Ins. Co.*, 744 F.Supp.2d at 1352; *Travelers Indemnity Co. of Conn. v. Douglasville Development, LLC*, Civil Action No. 07-CV-410-JOF, 2008 WL 4372004 (N.D. Ga. Sept. 19, 2008). Courts may determine based on the facts and circumstances of the case that an insured's delay in giving notice of a claim to his insurer was unjustified and unreasonable as a matter of law. *E.g. Illinois Union Ins. Co.*, 744 F.Supp.2d at 1352; *Plantation Pipeline*, 537 S.E.2d at 165 (affirming entry of summary judgment in favor of insured); *Allstate Ins. Co. v. Walker*, 254 Ga.App. 315, 562 S.E.2d 267 (2002) ("An unexcused significant delay in notifying an insurer about an incident or lawsuit, ... may be unreasonable as a matter of law."); *Kay–Lex Co.*, 649 S.E.2d at 608 (rejecting insured's excuses for failing to give notice of occurrence and affirming summary judgment in favor of insurer); *Lankford v. State Farm Mut. Auto. Ins. Co.*, 307 Ga.App. 12, 703 S.E.2d 436, 439 (2010) ("unjustifiable delay may be found as a matter of law to have been so unreasonable as to foreclose coverage"); *S. Guar. Ins. Co. v. Miller*, 183 Ga.App. 261, 358 S.E.2d 611 (1987).

Courts applying Georgia law have held that delays of as little as three to four months preclude recovery as a matter of law. *See Diggs v. S. Ins. Co.*, 172 Ga.App. 37, 321 S.E.2d 792, 793 (1984) (delay of three months between filing of lawsuit and notice to insurer unreasonable as matter of law); *Hathaway Development Co. v. Illinois Union Ins. Co.*, 274 Fed.Appx. 787 (11th Cir. 2008) (per curiam) (delays of four, five, and eight months unreasonable as matter of law); *LeBlanc*, 494 Fed.Appx. 17, 23 (insured's four-month delay held unreasonable under Georgia law, absent a valid excuse); *Cotton States Mut. Ins. Co. v. International Surplus Lines Ins. Co.*, 652 F.Supp. 851, 856 (N.D. Ga. 1986) ("The Georgia courts have repeatedly held that where no valid excuse exists, failure to give written notice for periods in the range of four to eight months is unreasonable as a matter of law."); *Advocate Networks, LLC v. Hartford Fire Ins. Co.*, 296 Ga. App. 338, 674 S.E.2d 617 (2009) (four-month delay); *Bituminous Casualty Corp.*, 209 S.E.2d 6 (four-month delay); *Caldwell*, 385 S.E.2d 97, 99–100 (six to ten month delay); *Richmond*, 140 Ga.App. 215, 231 S.E.2d at 249 (1976) (eight month delay); *Evercare Co.*, 699 F.Supp.2d at 1368 (nine-month delay unreasonable as matter of law).

 In addressing whether an insured's purported compliance with a notice

requirement can be determined as a matter of law, courts look to the reasons provided by the insured for the delay. *Advocate Networks, LLC*, 674 S.E.2d at 619. An insured's duty to provide notice to the insurer is triggered when the insured actually knew or should have known of the possibility that it might be held liable for the offense in question. *Forshee*, 711 S.E.2d at 31; *S. Carolina Ins. Co. v. Coody*, 957 F.Supp. 234, 237–38 (M.D. Ga. 1997). This is an objective standard, viewed from the perspective of the ordinary policyholder. *Guar. Nat'l Ins. Co. v. Brock*, 222 Ga.App. 294, 474 S.E.2d 46, 48 (1996); *Evercare Co.*, 699 F.Supp.2d at 1366, *aff'd*, 430 Fed.Appx. 795 (11th Cir. 2011) (finding that insured's excuse for giving late notice, based on subjective belief that it did not know third party's claims involved offenses for which it could be held liable within the policy period, was insufficient); *Coody*, 957 F.Supp. at 238 n. 5 (noting that inquiry into whether insured should have known of its potential liability has an objective element). "Relevant circumstances include the nature of the event, the extent to which it would appear to a reasonable person in the circumstances of the insured that injuries or property damage resulted from the event, [ ] the apparent severity of any such injuries or damage, [and] whether anyone gave an indication that he intended to hold the insured responsible for the event and resulting injuries." *Forshee*, 711 S.E.2d at 31–32 (citing cases); *Miller*, 358 S.E.2d at 612 ("[I]t is the nature and circumstances of 'the accident' or 'the incident' and the immediate conclusions an ordinarily prudent and reasonable person would draw therefrom that determine whether an insured has reasonably justified his decision not to notify the insurer.").

 But, an insured cannot avoid the notice requirement by relying on its subjective belief that it has no liability.

*E.g., Coody*, 957 F.Supp. at 238; *Richmond*, 231 S.E.2d at 249 ("Justification for failure to give notice as soon as practicable ... may not include the insured's conclusion 'that he was free of fault and that there was no liability to the other party.' "); *Illinois Union Ins. Co. v. NRI Constr. Inc.*, 846 F.Supp.2d 1366, 1371–72 (N.D. Ga. 2012) (finding that the insured's subjective belief that subcontractor employee's fall could not subject it to liability was not sufficient to avoid policy's notice requirement and was not objectively reasonable under the circumstances); *Evercare Co.*, 699 F.Supp.2d at 1366; *Douglasville Dev., LLC*, 2008 WL 4372004, at *5 ("[A]n insured may not independently determine whether 'an offense which may result in a claim' is covered or will ultimately result in a claim."); *EVI Equip., Inc. v. N. Ins. Co. of New York*, 188 Ga. App. 818, 374 S.E.2d 788, 790 (1988) ("In other words, we do not accept EVI's anomalous contention that it had no duty to report, "as soon as practicable," a claim which now is the basis of its assertion of coverage under the policy."). Georgia law requires "more than just ignorance" to avoid the enforcement of a valid notice provision. *E.g., Allstate Ins. Co. v. Walker*, 254 Ga.App. 315, 562 S.E.2d 267 (2002); *Townsend*, 397 S.E.2d at 62.

Respondents assert that genuine issues of material fact remain to be tried as to whether their delay in providing notice to Allstate was justified. Specifically, Respondents contend the following "undisputed" facts warrant denial of summary judgment in Allstate's favor:

(1) Prior to the November 21, 2014 "raid" of the premises, Respondents had never received any notice from law enforcement or Luxottica about any alleged issues regarding alleged counterfeit goods at the Discount Mall;

(2) Respondents (as opposed to their tenants) were not the subject of the No-

vember 21, 2014 raid and were not charged or cited by law enforcement for any wrongdoing;

(3) Luxottica's December 9, 2014 and April 22, 2015 letters: (a) were not addressed to any of the Respondents, but were instead sent to the Discount Mall Shopping Center and addressed only to: "Dear Sir/Madam;" (b) were not sent to the business address or home address or registered agent of the Respondents; (c) provided no actual evidence that the allegations contained in the letters were true; (d) did not identify any subtenant who allegedly was selling counterfeit products bearing the mark of Luxottica's merchandise at the Discount Mall; and (e) did not include any demand or claim for damages. (Resp. at 22–23.) Respondents further argue that questions exist over whether there was an "occurrence," or "offense" as those terms are defined in the Policies requiring notice to Allstate—though they offer no evidence or support for their assertions. Respondents also argue that absent a demand for money by Luxottica in the December 2014 and April 2015 letters, there was no "claim" for which Allstate required notice. (Resp. at 24 (citing *Insite–Properties, Inc. v. Jay Phillips, Inc.*, 271 N.J.Super. 380, 385, 638 A.2d 909 (1994) (construing "claim" as a "demand for money or money damages received by the Insured during the Policy Period")).

Coverage for advertising injury under Coverage B differs from Coverage A for bodily injury and property damage because it is not dependent on an "occurrence," i.e. an accident. Berry, Stephen J., Georgia Property and Liability Insurance Law § 4:20 (2013 ed.) Rather, Coverage B insurance "applies to 'personal and advertising injury' caused by an offense arising out of [the insured's] business," and "advertising injury" is defined as injury arising out of one or more enumerated "of-

fenses." (Policy, Coverage B § 1, Doc. 2–2 at 74.) The Court therefore rejects Respondents' assertion that disputes of fact exist regarding whether there was an "occurrence" triggering Respondent's duty under the notice provision because whether there was an "occurrence" is irrelevant under the circumstances of this case.

Although the term "claim" is not a defined term in the Policies, the Court declines to interpret the term as narrowly as Respondents suggest. In interpreting similar notice provisions, Georgia courts have consistently held that the insured's duty to give notice "as soon as practicable of an occurrence or an offense which may result in a claim," is triggered when the *potential* for liability related to an occurrence or offense is objectively known to the insured. *See, e.g. Forshee*, 711 S.E.2d at 31–32; *see also* Black's Law Dictionary (9th ed.) (defining "claim" as "[1] The aggregate of operative facts giving rise to a right enforceable by a court, [2] The assertion of an existing right; any right to payment or to an equitable remedy, [and] [3] a demand for money, property, or a legal remedy to which one asserts a right ...").

For example, in *Travelers Indemnity Co. of Conn. v. Douglasville Development, LLC*, the court rejected the insured's argument that it had no notice of a "claim" until it received the complaint in the underlying suit because its prior communications with the claimants had been about requests for non-monetary relief from soil and sediment damages resulting from increased stormwater from the insured's upstream development site. 2008 WL 4372004, at *5. The court characterized the insured's argument as "factually incorrect and legally unsupportable" in light of the claimants in the underlying suit having sent a "Notice of Intent to Sue" under the Clean Water Act three months prior to filing suit that expressly "provided that any future suit would seek injunctive re-

lief, civil penalties and costs of litigation and that Defendant would be liable for damages recoverable under state law claims for nuisance, trespass, negligence, negligence per se, riparian rights, bad faith attorneys' fees, and punitive damages." *Id.* The court concluded that the insured was aware of "an offense which may result in a claim" when it received the notice letter that laid out the legal basis of each of the potential claims, and demanded various forms of relief, reasoning that the information in the notice letter "would certainly have put a reasonable party on notice that it had taken actions which might result in a legal claim and that its insurance company might wish to investigate." *Id.* at *4. Thus, the insured's four month delay in notifying its insurer between receipt of the plaintiffs' notice letter and the filing of the lawsuit was held unreasonable as a matter of law. *Id.* at *4–*5.

Similarly, in cases involving advertising injury arising out of alleged intellectual property infringement, Georgia courts have found that a notice letter from a potential claimant is sufficient evidence from which the court can find that an insured should have known of an offense triggering the duty to notify his insurer. *Evercare Co.,* 699 F.Supp.2d at 1366–67; *Owners Ins. Co. v. Gordon,* CIV.A.1:07–CV–0369JFK, 2008 WL 552878, at *7–8 (N.D. Ga. Feb. 26, 2008) (King, M.J.), *aff'd,* 315 Fed.Appx. 146 (11th Cir. 2008). Here, Luxottica's December 2014 cease and desist letter advised Respondents that: (1) thousands of counterfeit products bearing Luxottica's trademarks being sold by ten-

ants/vendors at the Discount Mall had been seized by law enforcement during a visit to the Discount Mall on November 21, 2014; (2) Luxottica is entitled to bring a civil lawsuit under the Lanham Act for trademark infringement and seek injunctive relief and an award of damages; (3) Respondents as landlords may be liable for the trademark violations of their tenants; and (4) Luxottica intended to hold Respondents responsible for all damages and fees if they failed to take action to stop the infringing sales. (Ex. A, Allstate MSJ, Doc. 51–4 at 34–37.) The April 2015 letter further advised Respondents that Luxottica discovered that vendors at the discount mall were still engaging in counterfeit sales and provided identifying information for four vendors from whom Luxottica's investigator was able to purchase counterfeit Luxottica merchandise. The April 2015 letter reiterated Luxottica's intention to hold Respondents liable and the basis for such liability. (Ex. A, Allstate MSJ, Doc. 51–4 at 48–52.)

Despite their attempt to call into question their receipt of Luxottica's cease and desist letters,[17] Respondents admitted to having received these letters in the underlying lawsuit. (*Luxottica Group, S.p.A., et al v. Airport Mini Mall, LLC, et al,* Civil Action No. 1:15–cv–01422–AT, Answer, Doc. 15 ¶ 40; Am. Answer, Doc. 85 ¶¶ 40, 43.) Respondents' property manager, Greg Dickerson, testified that he received both letters in the mail addressed to the discount mall, and provided them to Respondents and their legal counsel, Mr. Louis Bridges.[18] (Dickerson Dep. at 27–40.) Thus,

**17.** The December 2014 letter is addressed principally to "Old National Discount Mall" but copies were also sent to Airport Mini Mall, LLC's "Legal Department" at a P.O. Box and to "Donald Yeh & Jerome Yeh, Registered Agent" at an address on Tilly Mill Road. Similarly, the April 2015 letter sent to "Owner/Manager" of the Old National Discount Mall" was sent by carbon copy to Air-

port Mini Mall, LLC care of Donald Yeh and Jerome Yeh, and to Yes Assets, LLC care of Jerome Yeh at an address on "Clearview Pkwy" in McDonough, Georgia.

**18.** The fact that Respondents may have timely notified their attorney of their receipt of Luxottica's two cease and desist letters (who in turn did not notify Allstate before June 22,

the fact that the cease and desist letters were addressed only to "Old National Discount Mall" and sent to the Discount Mall's physical address is insufficient to create a genuine dispute of material fact in response to Allstate's motion.

Respondents' remaining contentions imply that their failure to notify Allstate of Luxottica's claims until after the lawsuit was filed was because there was no indication Respondents could be held responsible for the alleged sale of counterfeit goods at the discount mall by their tenants. Essentially, the crux of Respondents' justification for failing to notify Allstate after receiving Luxottica's cease and desist letters is that Respondents did not believe they were liable for the alleged infringing acts of their tenants. This was the same defense Respondents raised unsuccessfully in the underlying litigation with Luxottica. Luxottica's cease and desist letters provided Respondents with information from which they should have known of the potential for liability and cited applicable legal authority for imposing contributory liability on Respondents as landlords sufficient to trigger the duty to provide notice to Allstate of "an offense which may result in a claim." *See Evercare Co.*, 699 F.Supp.2d at 1366–67 (finding insured's explanation for delayed notice unreasonable as a matter of law where it was undisputed that insured received competitor's letter notifying insured of its alleged false, misleading and/or deceptive advertising because an ordinary policyholder under the circumstances should have known that a claim may arise under the policy); *Gordon*, 2008 WL 552878, at *6–7 (finding that insured reasonably should have known that disputes with former business partner could have resulted in a

2015) is not a sufficient justification for their failure to provide immediate notice to Allstate. *See Bituminous Cas. Corp.*, 209 S.E.2d at 10 (holding that if there was unexcusable

claim for copyright infringement based on letters in which former partner claimed ownership rights to copyrighted design plans and notified insured of obligation to pay a licensing fee for future use of plans); *see also Brit UW Ltd.*, 6 F.Supp.3d at 1329–30 (finding that insured's failure to notify its insurer of accident until the underlying complaint was filed barred coverage under the insurance policy because policy language requiring notice of any occurrence that "may result in a claim" precluded an insured from withholding notice based on its unilateral assessment of the liability issues arising from an occurrence). "Indeed, [an] insured's potential liability " 'is the very issue which the [insurance] company must have reasonable opportunity to investigate with promptness, and which requires a prompt notice of the occurrence.' " *Brit UW Ltd.*, 6 F.Supp.3d at 1329–30 (citing *Richmond*, 231 S.E.2d 245); *Douglasville Development, LLC*, 2008 WL 4372004, at *5 (internal quotations and citations omitted); *NRI Constr. Inc.*, 846 F.Supp.2d at 1871–72.

The Policies contain separate obligations for providing notice: (1) the insured must notify Allstate "as soon as practicable of an 'occurrence' or an offense which may result in a claim," and (2) the insured must subsequently notify Allstate "as soon as practicable" "[i]f a claim is made or 'suit' is brought." (Policy § IV(2)(a)&(b), Doc. 2–2 78–79.) Thus, the fact that Respondents notified Allstate of the underlying lawsuit within one month of being served does not obviate Respondents of their obligation in providing pre-suit notice of Luxottica's claims raised in the two cease and desist letters.

delay by insured's attorney in forwarding the papers, the insured is chargeable with his attorney's failure to act with promptness).

The Court finds Respondents' proffered justification insufficient as a matter of law to defeat Allstate's motion for summary judgment on the lack of timely notice as a condition precedent to coverage. Respondents have failed to create a genuine dispute of material fact regarding whether they had a legally sufficient reason or excuse for not providing prompt notice to Allstate of the circumstances giving rise to Luxottica's contributory trademark infringement claim. Accordingly, Allstate was not obligated to provide coverage for the claim at issue and summary judgment is warranted in its favor.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Allstate's Motion for Summary Judgment [Doc. 51]. The Clerk is **DIRECTED** to enter judgment in Allstate's favor and close the case.

**IT IS SO ORDERED** this 26th day of September, 2017.